**NATIONAL ASSOCIATION OF COUNTIES, et al.**

v.

**James A. BAKER, III, Secretary of the Treasury, Appellant.**

**No. 87–5287.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 24, 1987.
Decided March 11, 1988.

Barbara C. Biddle, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., and John F. Cordes, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellant.

David C. Vladeck, with whom Alan B. Morrison and Thomas H. Stanton, Washington, D.C., were on the brief, for appellees.

Before WALD, Chief Judge, SENTELLE, Circuit Judge, and GIBSON,[*] Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge FLOYD R. GIBSON.

FLOYD R. GIBSON, Senior Circuit Judge:

James A. Baker, III, Secretary of the Treasury (Secretary), appeals an order of the district court[1] which requires the Secretary to disburse to the individual local governments entitled to payment under the Revenue Sharing Program approximately 180 million dollars of Revenue Sharing Trust Fund monies which were sequestered pursuant to the Balanced Budget and Emergency Deficit Control Act of 1985. (Gramm–Rudman–Hollings).[2] The plaintiffs, a number of individual local governments and three associations representing local governments, challenged the transfer of these funds to the General Fund of the Treasury and sought an injunction requiring the Secretary to release the funds to the local governments. The district court held the transfer of funds unlawful and ordered the Secretary to disburse the funds. The district court reasoned that although the Secretary lawfully sequestered the funds for Fiscal Year (FY) 1986 pursuant to Gramm–Rudman–Hollings, the funds should be distributed in FY 1987 in compliance with Gramm–Rudman–Hollings § 256(a)(2), codified at 2 U.S.C. § 906(a)(2) (Supp. IV 1986), which deals with the effect of the sequestration order.

The Secretary raises two arguments on appeal. First, the Secretary argues that the district court lacked subject matter jurisdiction over this case because the claims raised by the local governments are Tucker Act claims which may only be brought in the Claims Court. Second, the Secretary argues that the district court erred in holding that the Revenue Sharing Trust Funds sequestered under Gramm–Rudman–Hollings were required to be disbursed to the local governments. While we disagree with the Secretary's argument that the district court lacked subject matter jurisdiction, we agree with the Secretary that the district court erred in requiring the sequestered Revenue Sharing Trust Funds to be disbursed to the local governments. Accordingly, we reverse.

I. BACKGROUND

Congress enacted the Revenue Sharing Act, 31 U.S.C. § 6701 (1982), to provide

---

[*] Of the United States Court of Appeals for the Eighth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The district court's Memorandum Opinion and Order and Judgment is published at 669 F.Supp. 518 (D.D.C.1987).

2. Pub.L. 99–177, 99 Stat. 1037 (Dec. 12, 1985), codified at 2 U.S.C. § 901 *et seq.* (Supp. IV 1986).

noncategorical financial assistance to local governmental units in the form of annual entitlements. Pursuant to the Act payments to the local governments are made through the State and Local Government Fiscal Assistance Trust Fund, of which the Secretary of the Treasury is personally the trustee. *Id.* § 6703(a).

Congress appropriated $4,566,700,000 to the Trust Fund for the entitlement period coinciding with FY 1986; however, this amount was subsequently reduced by an Act of Congress to $4,185,000,000. Pub.L. 99–160, 99 Stat. 909, 924 (Nov. 25, 1985). On December 12, 1985, the President signed into law the Balanced Budget and Emergency Deficit Control Act of 1985, Pub.L. 99–177, 99 Stat. 1037, codified at 2 U.S.C. § 901 *et seq.* (Supp. IV 1986), popularly known as "Gramm–Rudman–Hollings." The purpose of the Gramm–Rudman–Hollings legislation is to eliminate the federal budget deficit by 1991.

On February 1, 1986, the President issued an order pursuant to Gramm–Rudman–Hollings § 252(a)(1), codified at 2 U.S.C. § 902(a)(1), which sequestered, *inter alia,* $179,955,000, or 4.3%, of the monies appropriated to the State and Local Government Fiscal Assistance Trust Fund. 3 C.F.R. 254 (1987). In *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), the Supreme Court invalidated the President's sequestration order. However, Congress passed and the President signed legislation ratifying the President's February 1st order. P.L. 99–366, 100 Stat. 773 (July 31, 1986).

In April 1986 the President signed the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L. 99–272, 100 Stat. 82, 327, § 14001 (April 7, 1986) (COBRA). COBRA terminated the Revenue Sharing Program and provided for the winding down of the program at the close of the 1986 entitlement period.

In January and February 1987 representatives of the local governments requested the Secretary to release the Trust Fund monies sequestered under Gramm–Rudman–Hollings. The Secretary informed them that the funds would not be released

and had been transferred to the General Fund of the Treasury.

The local governments filed an action for declaratory and injunctive relief in the district court. Cross motions for summary judgment were filed and the district court granted the local governments' motion.

## II. DISCUSSION

### A. Jurisdiction

The Secretary argues that the district court lacked subject matter jurisdiction over this case because the claim raised by the local governments is a claim for "money damages" and thus may only be brought in the Claims Court pursuant to the Tucker Act. We disagree.

We begin this analysis by determining whether any other federal statute provides a waiver of sovereign immunity for the type of relief sought by the local governments. The local governments argue that the Administrative Procedure Act (APA) provides such a waiver and that 28 U.S.C. § 1331 (1982) provides subject matter jurisdiction for the district court to decide this substantial federal question. Section 702 of the Administrative Procedure Act provides a waiver of sovereign immunity for actions "stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority" provided, however, that the relief sought is "relief other than money damages." 5 U.S.C. § 702 (Supp. IV 1986). Thus we must first determine whether the relief the local governments seek is "money damages" within the meaning of the Administrative Procedure Act.

The Secretary argues that the relief sought by the local governments, although framed in equitable terms, is tantamount to a money judgment and thus the APA's waiver of sovereign immunity is unavailable to the local governments. This court, however, rejected the Secretary's analysis in *Maryland Department of Human Resources v. Department of Health and Human Services,* 763 F.2d 1441 (D.C.Cir. 1985). In *Maryland,* this court concluded that the term "money damages" as used in

the APA refers to compensatory relief or damages "given to the plaintiff to substitute for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Id.* at 1446 (emphasis in original) (quoting D. Dobbs, *Handbook on the Law of Remedies* 135 (1973)). We do not believe that it is necessary to repeat all of what was said in *Maryland,* the principal precedent on which we rely.

In the present case the relief sought by the local governments is not money damages as that term is used in the APA. The local governments are seeking funds to which a statute allegedly entitles them rather than money in compensation for the losses they may have suffered by virtue of the withholding of those funds. Therefore, the relief sought by the local governments is specific relief and not classical money damages. If the relief the local governments sought was compensation for damages resulting from the Secretary's actions and not the disbursal of the withheld funds, then the APA would not have provided a waiver of sovereign immunity.

We note that several other circuits have followed a different approach. For example the Tenth Circuit explicitly rejected the approach followed in *Maryland* stating "a plaintiff may not transform a claim for monetary relief into an equitable action simply by asking for an injunction that orders the payment of money." *State of New Mexico v. Regan,* 745 F.2d 1318, 1322 (10th Cir.1984), *cert denied,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *see also Commonwealth of Massachusetts v. Departmental Grant Appeals Bd.,* 815 F.2d 778, 783 (1st Cir.1987) ("We read the words 'money damages' to mean any monetary relief, whether it is in the nature of damages or in the nature of specific relief."); *cf. Chula Vista City School Dist. v. Bennett,* 824 F.2d 1573, 1579 (Fed.Cir.1987) ("It is well settled that where the prime effort of the plaintiff is to obtain money from the Government, the exclusive juris-

diction of the Claims Court cannot be avoided by drafting a complaint which appears to seek only injunctive, mandatory, or declaratory relief against the Government.") (footnote omitted), *cert. denied,* —— U.S. ——, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988); *Amoco Production Co. v. Hodel,* 815 F.2d 352, 361 (5th Cir.1987) ("in the 'murky' area of Tucker Act jurisprudence ... one of the few clearly established principles is that the substance of the pleadings must prevail over their form"), *pet. for cert. filed,* 56 U.S.L.W. 3184 (Sept. 22, 1987); *State of Minnesota by Noot v. Heckler,* 718 F.2d 852, 858–59 (8th Cir.1983). *See generally Gibson v. Block,* 619 F.Supp. 1572, 1575 (N.D.Ind.1985) (surveying the "different formulae [that] exist to test the essence of the plaintiff's claim").

We believe that the relief sought by the local governments is not a claim for money damages within the meaning of the APA, notwithstanding the fact that the claim, if successful, may require the payment of money by the federal government. Therefore since the APA provides a waiver of sovereign immunity for the local government's claims the district court properly exercised its general federal question jurisdiction over these claims. We will now consider the Tucker Act's applicability to the local government's claims.

■ The Tucker Act provides a waiver of sovereign immunity for two classes of claims. Stated briefly the first class includes claims based on contract and the second class involves claims founded on the Constitution, any Act of Congress, or regulation of the Executive.

The Tucker Act confers exclusive jurisdiction on the Claims Court for all cases involving claims against the United States for money damages exceeding $10,000 "founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort...." 28 U.S.C. §§ 1346(a)(2), 1491(a)(1) (1982).[3]

---

**3.** Under the "Little Tucker Act", the district courts and the Claims Court have concurrent

jurisdiction for claims which do not exceed $10,000. 28 U.S.C. § 1346(a)(2) (1982). The

The Secretary does not argue that this case falls within the "contracts" branch of Tucker Act jurisdiction. Rather, the Secretary argues that this case falls within the Claims Court jurisdiction over claims "against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department...." 28 U.S.C. § 1491(a)(1).

The classic explication of these words is found in *Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 178 Ct.Cl. 599 (1967):

> 'But it is not every claim involving or invoking the Constitution, a federal statute, or a regulation which is cognizable here. The claim must, of course, be for money. Within that sphere, the non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury.... In the second group, where no such payment has been made, the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum. *Id.* 372 F.2d at 1007.'

*Commonwealth of Massachusetts v. Departmental Grant Appeals Bd.*, 815 F.2d at 786.

■ However, it is clear that while providing a waiver of sovereign immunity, the Tucker Act does not provide a substantive right to recover. The claimant invoking Tucker Act jurisdiction must establish a substantive right to recover money damages.

"Big Tucker Act" however vests exclusive jurisdiction in the Claims Court for all Tucker Act Claims that exceed $10,000. 28 U.S.C. § 1491(a)(1) (1982).

**4.** To the extent that dicta in *International Union v. Donovan*, 746 F.2d 855, 861 n. 5 (D.C.Cir. 1984), *cert. denied*, 474 U.S. 825, 106 S.Ct. 81, 88 L.Ed.2d 66 (1985), suggests that, in all cases, the

In *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*), the Supreme Court explained the noncontractual basis of Tucker Act jurisdiction: "[T]he claimant must demonstrate that the source of substantive law he relies upon ' "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." ' " *Id.* at 216–17, 103 S.Ct. at 2967–68 (quoting *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976) (quoting *Eastport Steamship Corp.*, 372 F.2d at 1009)).

Thus, in order for the Tucker Act to apply to this case it must be established that a federal statute mandates the compensation sought by the local governments.

■ The Secretary argues that the Revenue Sharing Act mandates compensation because the Revenue Sharing Trust Funds withheld by the Secretary were entitlements.[4] We disagree with the Secretary for two reasons. First, we do not believe that the Revenue Sharing Act can fairly be interpreted as mandating the compensation which the local governments seek. Second, we believe that the compensation mandating requirement refers to cases where "classical money damages" are sought by the plaintiff and not to cases such as the present case where the relief sought is only a disbursal of the money to which a statute allegedly entitles them.

The Revenue Sharing Act does not expressly mandate compensation. The Secretary cannot point to any specific language in the Revenue Sharing Act which commands "the United States to pay the plaintiff some money, upon proof of conditions which he is said to meet." *Eastport Steamship Corp.*, 372 F.2d at 1008.

The only language appearing in the Revenue Sharing Act which arguably supports

appropriate remedy for seeking funds under an entitlement program is under the Tucker Act, we disagree. Such determinations must be made only after considering the entitlement program and its authorizing legislation in order to determine whether the statutes can fairly be interpreted as mandating compensation.

the Secretary's position is Section 6702 which provides:

> Each unit of general local government *is entitled to an amount* equal to any amount allocated to the government under this chapter for each entitlement period. Each State government shall be paid an amount equal to any allocation made for each entitlement period.

31 U.S.C. § 6702 (1982) (emphasis added). We do not believe that this language can be fairly interpreted as compensation mandating.

Because the Revenue Sharing Act does not expressly provide a cause of action in favor of the local governments, the only remaining question is whether an implied cause of action for money would lie in favor of the local governments.

■ While it is true that the Revenue Sharing Act creates substantive rights in favor of the local governments, it is also true that substantive rights standing alone do not imply a remedy for money damages under the Tucker Act. *United States v. Testan,* 424 U.S. at 401, 96 S.Ct. at 954; *Mitchell II,* 463 U.S. at 236, 103 S.Ct. at 2978 (Powell, J., dissenting).

The Revenue Sharing Act contains no provision that expressly makes the United States liable for mismanagement of the Revenue Sharing Trust Funds. Nor is there any indication in the legislative history that Congress intended to provide the local governments with a substantive right to recover money damages due to mismanagement of the Revenue Sharing Trust Funds.

■ We are reluctant to interpret the Revenue Sharing Act as mandating compensation in the absence of clear Congressional intent, because to do so would result in an implied right of action in favor of Trust Fund recipients. *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. at 954 ("the Tucker Act is merely jurisdictional, and grant of a right of action must be made with specificity"); *Maryland,* 763 F.2d at 1450 ("an implied cause of action for damages against the United States will not lightly be inferred") (citing *Army &*

*Air Force Exchange Service v. Sheehan,* 456 U.S. 728, 739–40, 102 S.Ct. 2118, 2124–25, 72 L.Ed.2d 520 (1982)). A substantive right to recover is not to be implied in the absence of clear Congressional intent. We do not believe the Revenue Sharing Act or its legislative history reflects an intent by Congress to provide the local governments with a substantive right to recover damages due to the improper withholding of funds by the Secretary.

The Secretary argues that because the Revenue Sharing Act creates a Trust Fund with the Secretary as trustee the statute is similar to the statutes and regulations involved in *Mitchell II.* In *Mitchell II* the Supreme Court held that the existence of a trust relationship and fiduciary obligations between the United States and Indian allottees of land held in trust by the United States established that the statutes and regulations were compensation mandating.

While it is true that the Revenue Sharing Act establishes a Trust Fund and names the Secretary as the trustee, we believe the Act creates only a limited trust relationship similar to the trust discussed in *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I*). In *Mitchell I* the Supreme Court concluded that the General Allotment Act does not confer a right to recover money damages against the United States. In *Mitchell II* the Supreme Court discussed *Mitchell I* and placed great significance on the fact that the "trust language of the Act does not impose any fiduciary management duties or render the United States answerable for breach thereof...." *Mitchell II,* 463 U.S. at 217–18, 103 S.Ct. at 2968–69. We believe that the Revenue Sharing Act creates only a limited trust relationship similar to the trust created by the General Allotment Act under *Mitchell I.*

> It is plain, then, that when Congress enacted the General Allotment Act, it intended that the United States 'hold the land ... in trust' not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alien-

ation of the land and to ensure that allottees would be immune from state taxation.

*Mitchell I*, 445 U.S. at 544, 100 S.Ct. at 1354 (footnote omitted).

It is clear that Congress created the State and Local Government Fiscal Assistance Trust Fund "[t]o insure that a constant source of funds [would] be available for the five year duration of the revenue sharing program." S.Rep. No. 1050, 92nd Cong., 2nd Sess., *reprinted in* 1972 U.S. Code Cong. & Admin.News 3874, 3892.

The creation of the Trust Fund also furthered Congress' intent that the Trust Funds would be available without fiscal year limitation and that the monies would only be used for payments to state and local governments. *Id.*

We do not think that when Congress created this Trust Fund and made the Secretary trustee Congress did so with the intent that the trustee would be subject to money damages for breaches of fiduciary duties. Rather, Congress created the Trust Fund in order to ensure constant funding for the Revenue Sharing Programs. Indeed, there is no indication in the Revenue Sharing Act or its legislative history that the Secretary owes any common law fiduciary obligations to Trust Fund recipients. By creating the Trust Fund Congress was able to appropriate funds in advance, for the life of the program, thus enabling the local governments to budget their programs in advance. *Id.* at 3885. Thus, we do not believe that the fact that the Revenue Sharing Act created a Trust Fund and made the Secretary the trustee of this fund compels the conclusion that the Revenue Sharing Act is compensation mandating.

We note that there is a common thread running through the cases discussing Tucker Act jurisdiction based on federal compensation mandating law. These cases generally involve nonmonetary statutory rights which have been abridged and claimants seeking money damages as compensa-

tion for the denial of their statutory rights. *Mitchell II*, 463 U.S. at 219, 103 S.Ct. at 2969 ("We begin by describing these sources of substantive law. We then examine whether they can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties they impose."). The case at bar, however, is distinguishable on its facts. The Revenue Sharing Act creates monetary entitlements, or rights, and the local governments seek only to enforce those rights. They do not seek monetary compensation because their rights have been abridged. Thus, the local governments seek specific relief. There is a difference between monetary relief in the form of compensation on the one hand, and monetary relief in the form of specific relief, on the other.

Examples of federal law which may be fairly characterized as compensation mandating include, among others, the Fifth Amendment's prohibition on taking private property for public uses without just compensation, the Back Pay Act, 5 U.S.C. § 5596(b)(1) (1982), and the Outer Continental Shelf Lands Act, 43 U.S.C. § 1339(a) (1982).[5]

Finally, we note that our determination that the Revenue Sharing Act is not a compensation mandating statute supports our conclusion that the APA provides a waiver of sovereign immunity for the district court to exercise jurisdiction pursuant to 28 U.S.C. § 1331. If the APA were construed to preclude the local governments from invoking its waiver of sovereign immunity then the action of the Secretary would be immune from judicial review. Such a result, however, would be inconsistent with Supreme Court precedent holding that:

[I]n administrative cases where the organic statute is silent on the subject of judicial review '[t]he presumption that review is available ... coupled with the absence of any indication in the statute that the decision is committed wholly to

---

**5.** *See United States v. Causby*, 328 U.S. 256, 267, 66 S.Ct. 1062, 1068, 90 L.Ed. 1206 (1946) (Fifth Amendment); *Mitchell II*, 463 U.S. at 217, 103 S.Ct. at 2968 (Back Pay Act); *Amoco Production Co. v. Hodel*, 815 F.2d at 360 (5th Cir.1987) (Outer Continental Shelf Lands Act).

the discretion of the agency or that review is otherwise precluded ... leads to the conclusion that the district court[] would have had jurisdiction under the general grant of jurisdiction over cases involving federal questions....'

*Maryland,* 763 F.2d at 1445 (quoting *Bell v. New Jersey,* 461 U.S. 773, 778 n. 3, 103 S.Ct. 2187, 2190 n. 3, 76 L.Ed.2d 312 (1983) (dictum)) (citations omitted).

As already noted, the Tucker Act only confers jurisdiction on the Claims Court for claims involving money. *Mitchell II,* 463 U.S. at 216–17, 103 S.Ct. at 2967–68. Thus, at first glance the Tucker Act waiver of sovereign immunity, which only applies to claims for money, and the APA § 702 waiver of sovereign immunity, which applies to claims "seeking relief other than money damages," would appear to be mutually exclusive.

The Secretary argues, however, that Tucker Act jurisdiction and § 702 jurisdiction overlap.

> [T]he presence of a valid Tucker Act claim in this case raises the issue left open in *Maryland. Maryland* recognized that there is a potential overlap between APA/1331 jurisdiction and Tucker Act jurisdiction, because a monetary claim that is other than a classic 'money damages' claim—and which therefore qualifies for APA purposes— can still be the type of money claim that is cognizable under the Tucker Act. The Court reserved the question of whether the Tucker Act or the APA would control where both were applicable.

Appellants brief at 38.

Regardless of the merits of the Secretary's argument we need not decide this question which was presented, but not decided, in *Maryland.* Because we hold that the Revenue Sharing Act is not a compensation mandating statute there is no Tucker Act jurisdiction in this case that prevents the application of Section 702's waiver of sovereign immunity and thus there is no overlap between Section 702 and the Tucker Act.

6. The local governments do not challenge the

## B. *Merits*

█ The local governments challenge the Secretary's refusal to disburse approximately 180 million dollars of Revenue Sharing Trust Funds. The Secretary transferred the funds to the General Fund of the Treasury.

The Secretary's action was based on three interrelating statutes: the Revenue Sharing Act, COBRA, and Gramm–Rudman–Hollings. The Revenue Sharing Act established a financial assistance program for local governments authorized through FY 86 and COBRA terminated these programs at the end of the FY 86 entitlement period. Gramm–Rudman–Hollings required the sequestration of 4.3% of the funds appropriated to the Revenue Sharing Trust Fund for FY 86. The 180 million dollars at issue in this case represents the 4.3% sequestered under Gramm–Rudman–Hollings.

The issue before the court is whether the Secretary was within his statutory authority in refusing to disburse the Trust Fund monies sequestered pursuant to Gramm–Rudman–Hollings and returning these monies to the General Fund of the Treasury. In order to answer this question we must first determine the impact Congress intended the sequestration provisions of Gramm–Rudman–Hollings to have on the sequestered Trust Funds.[6]

We begin our analysis by looking at the plain language of the statute. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Gramm–Rudman–Hollings § 256(a)(2), codified at 2 U.S.C. § 906(a)(2) provides, in pertinent part:

> Any amount of new budget authority, unobligated balances, obligated balances, new loan guarantee commitments, new direct loan obligations, spending authority ... or obligation limitations which is sequestered or reduced pursuant to an order issued under section 902 of this title is permanently cancelled, *with the exception of amounts sequestered in special or trust funds, which shall re-*order sequestering the funds.

*main in such funds and be available in accordance with and to the extent permitted by law, including the provisions of this Act.*

2 U.S.C. § 906(a)(2) (Supp. III 1985) (emphasis added).

Determining the Congressional intent of the underscored language goes far toward resolving the issue before the court.

The district court held that:

The clear import of this language is that the $180 million of the Trust Fund that was sequestered was to remain "available" and be distributed according to the relevant authorizing statute and any subsequent legislation. In short, Gramm–Rudman froze $180 million of the Trust Fund for one fiscal year.

669 F.Supp. at 521.

While we agree with the district court that the Act provides that monies sequestered in Trust Funds were to remain available, we do not agree that the Act was intended to freeze or merely defer the payment of the funds for one fiscal year. We interpret this language of Gramm–Rudman–Hollings as a reduction in FY 86 budgetary resources, and as requiring the funds to remain available in the applicable Trust Fund as FY 87 budgetary resources.[7] Therefore, the funds can only be released if there is some independent source of legislation authorizing the Secretary to release the funds in FY 87. Since COBRA repealed the Revenue Sharing Act and its programs, the Secretary has no FY 87 authority to disburse the sequestered funds.

Although neither our interpretation of this language nor the district court's interpretation is compelled by the language of the statute on its face, we believe that construing this provision as a reduction of FY 86 budgetary resources is the only plausible interpretation in view of the Congressional intent in passing the legislation.

It is plain that the Congressional intent in enacting Gramm–Rudman–Hollings was to reduce the deficit. We think it is necessary to keep this Congressional objective in mind when interpreting the provisions of the legislation. Adoption of the local government's interpretation of this provision would not further Congressional objectives. Merely freezing the FY 86 entitlements and "resuscitating" them in FY 87 as FY 86 resources would not result in any meaningful deficit reduction and could be characterized by critics to be a sham. Although the FY 86 deficit would be reduced by the amount sequestered, releasing those funds in FY 87 would only increase FY 87 outlays and nullify the deficit reduction achieved in FY 86. In contrast to the interpretation urged by the local governments, our interpretation of this provision will result in meaningful deficit reductions. To illustrate, in FY 86 the sequestration order is put in place. This reduces FY 86 entitlements and the sequestered funds remain in the applicable Trust Fund. When the sequestration order expires the funds remain available as FY 87 budgetary resources, subject to subsequent Congressional direction. Thus a deficit reduction in FY 86 is achieved and the sequestered funds carry forward as FY 87 budgetary resources, thereby reducing the amount which must be appropriated in FY 87 to meet FY 87 obligations.

When divining Congressional intent we must also look to the general area to which the particular legislation was intended to apply. *United States v. Boisdore's Heirs*, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1850) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."). Section 256(a)(2) applies to many Special and Trust Funds previously established by Congress. *See* Plaintiff's Exhibit P (listing Special and Trust Funds gov-

---

**7.** The local governments argue that because Revenue Sharing Trust Funds are entitlements the Secretary was required to disburse the entire amount appropriated to the Trust Fund in 1986. This argument begs the question because as we discuss below we believe Gramm–Rudman–Hollings' sequestration provision was in-

tended to effect a reduction in FY 86 appropriations. It is clear that Congress has the power to reduce appropriations through subsequent legislation. Indeed, Congress originally appropriated $4,566,700,000 for FY 86, but subsequently reduced this appropriation to $4,185,000,000. Pub.L. 99–160, 99 Stat. 909, 924 (Nov. 25, 1985).

erned by § 256(a)(2)). Thus, the State and Local Government Fiscal Assistance Trust Fund is only one of many such Trust Funds which were affected by the Gramm–Rudman–Hollings sequestration order.

We believe the State and Local Government Fiscal Assistance Trust Fund can be characterized as an aberration. It is only because this Trust Fund was terminated by COBRA that we are presented with this question of statutory interpretation.

In fact, counsel for the Secretary noted in her brief and at oral argument that she knew of no other Trust Fund governed by § 256(a)(2) which was to terminate at the end of FY 86. Although our interpretation of § 256(a)(2) as applied to this Trust Fund results in the local governments' losing $180,000,000, when applied to the remaining Trust Funds governed by the provision, the sequestered funds are not lost but are merely carried forward as FY 87 budgetary resources. The result in this case may be harsh, but we believe it is consistent with Congressional intent. We are not prepared to allow the impact of the sequestration order on the aberrational State and Local Government Fiscal Assistance Trust Fund force a strained interpretation of the sequestration provision. Indeed as noted by the district court, the Secretary has released sequestered funds to beneficiaries of similar Special and Trust Funds for numerous other programs. The unique circumstance of the State and Local Government Fiscal Assistance Trust Fund is that the fund was terminated by COBRA at the close of FY 86.

Our interpretation of the effect of Gramm–Rudman–Hollings' sequestration provision is also supported by the limited legislative history that is available. Although Congress failed directly to address the effect of sequestration of Special and Trust Funds, in the Conference Report the section dealing with loan money referred by analogy to Gramm–Rudman–Hollings' treatment of such funds:

> This is analogous to the treatment of obligations from special, trust, and trust-revolving funds financed through permanent indefinite budget authority; *the ob-ligations from such funds* (if not exempt or subject to special rule) *would be reduced by the sequestration percentage, and the resulting level of estimated obligations would constitute a de facto obligation ceiling.* Assets of such funds would remain in those funds.

H.R.Conf.Rep. No. 433, 99th Cong., 1st Sess. 95, *reprinted in* 1985 U.S.Code Cong. & Admin.News 1012 (emphasis added). This language leads to the conclusion that although § 256(a)(2) provides that sequestered funds remain available in the Trust Fund, the sequestration provision operates as an appropriation *reduction* for FY 86.

The district court quoted a letter dated May 12, 1986 from the Office of Management and Budget (OMB) to Senator Malcolm Wallop as support for the construction of Gramm–Rudman–Hollings urged by the local governments. This letter "states that 'amounts sequestered in FY 1986 from non-exempt accounts [special or trust funds] *will become available* for obligation on October 1, 1986, unless some other provision in each account's authorizing statutes or a subsequent act of Congress prevents any subsequent expenditure.'" 669 F.Supp. at 521 (emphasis supplied by district court) (quoting Plaintiff's Exhibit P). The district court also found support for its decision in an opinion issued by the Comptroller General. *Id.* A close examination of these letters, however, leads to the opposite conclusion and bolsters the Secretary's argument. As is discussed below, the critical issue is whether the sequestered funds remained available as FY 86 or FY 87 budgetary resources. This issue was not addressed directly by either OMB or the Comptroller General. A close reading of these letters, however, supports our conclusion that the sequestration was intended to effect a reduction of FY 86 budgetary resources. Further, neither letter was written with specific reference to the Trust Fund at issue in this case which was terminated at the close of FY 86.

We believe that the district court failed to address the crux of the Secretary's argument. The critical issue is not whether the sequestered funds were to remain available

beyond the expiration of the sequestration order; this is squarely addressed by the language of the statute. 2 U.S.C. § 906(a)(2) ("amounts sequestered in special or trust funds, which shall remain in such funds and be available in accordance with and to the extent permitted by law"). The dispositive issue, not addressed by the statute, is whether the sequestered funds were to remain available as FY 86 budgetary resources or as FY 87 budgetary resources. As already discussed, we believe that Congress intended these funds remain available as FY 87 budgetary resources and available to the extent permitted by law. Thus, as a precondition to the Secretary's disbursing the funds to the local governments there must be applicable FY 87 legislative authority for the disbursal. COBRA repealed the Revenue Sharing Act and its programs at the completion of the FY 86 entitlement period, thus there is no FY 87 authority for the Secretary to disburse the funds. Faced with this situation the Secretary did the only thing that he could do, and that was to transfer the funds to the General Fund of the Treasury. In fact, COBRA authorizes the Secretary to transfer all funds remaining in the Trust Fund to the General Fund after all entitlements are completely made. COBRA, § 14001(a)(2). The Secretary paid the local governments their entire FY 86 entitlements—4.185 billion minus the 4.3% *reduction* mandated by Gramm–Rudman–Hollings—and the remaining 180 million had to be returned to the General Fund.

The district court noted that the sequestered funds were "no year" monies which may be expended without fiscal year limitation. Thus the district court reasoned that this supports the "conclusion that the sequestered funds would be resuscitated after fiscal year 1986...." 669 F.Supp. at 521. We agree that monies appropriated to the Trust Fund are available without fiscal year limitation, however because we believe Gramm–Rudman–Hollings resulted in a reduction in the FY 86 appropriation to the Trust Fund the provisions of the Revenue Sharing Act and COBRA, which were relied on by the district court, are inapplicable. The district court stressed the Reve-

nue Sharing Act which provided that "[a]mounts in the Trust Fund—remain available until expended." 31 U.S.C. § 6703(a)(2). Similarly, the district court noted that COBRA provides:

> [t]he Secretary of the Treasury shall continue to be the trustee of the Trust Fund, *which shall remain in existence until all entitlement payments* which are required to be made under the Revenue Sharing Act are made in accordance with the terms of such Act. Any funds remaining in the Trust Fund after all of such entitlement payments are *completely made* shall revert to the General Fund of the Treasury of the United States.'

669 F.Supp. at 522–23 (emphasis supplied by district court) (quoting COBRA, § 14001(a)(2)). The problem in the district court's reasoning and the position urged by the local governments is that it assumes the existence of appropriated funds. In doing so the district court failed to address the ultimate question in this case, which is whether the sequestered funds remained appropriated and available for expenditure. For the reasons already discussed we answer this question in the negative.

The Secretary acted consistently with the Revenue Sharing Act and COBRA by paying out all funds appropriated for the FY 86 entitlement period. Most of the Funds were paid in FY 86 as the quarterly entitlement payments became due. Moreover, some of the FY 86 appropriations were paid out in FY 87 consistent with the Revenue Sharing Act and COBRA. These payments included the reserve account monies that the Revenue Sharing Act authorized the Secretary to hold back for providing adjustments to entitlements at the close of an entitlement period. 31 U.S.C. § 6702(d). These reserve account monies were released on February 20, 1987.

Finally, the district court refused to give any deference to the Secretary's interpretation of the applicable statutes, stating, "[d]eference is not due, however, where as here, 'Congress has spoken to the precise question at issue.'" 669 F.Supp. at 523 (quoting *Chevron, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.

837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). We do not agree that Congress has addressed the precise question presented in this appeal. In addition we note that in *Chevron* the Supreme Court also stated: "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782.

Without deciding the extent to which we should defer, if at all, to the Secretary's interpretation, we note that the Secretary's interpretation and our decision find support in opinions issued by the OMB and the Comptroller General.

The OMB Director, James C. Miller III, interpreted Gramm–Rudman–Hollings' sequestration provision in a letter to Congressman Richard Cheney. In that letter Miller stated:

> Under the Balanced Budget and Emergency Deficit Control Act of 1985 amounts sequestered from permanent indefinite appropriations from trust and special funds ... are not treated as a permanent cancellation. The ... payments sequestered in FY 1986 would therefore become available for distribution October 1, 1986, unless some other provision in their authorizing statutes or subsequent act of Congress prevents their expenditure.

Joint Appendix at 104. We believe that this language is consistent with our interpretation of § 256(a)(2). We agree that sequestration did not result in an automatic cancellation, but rather was merely a reduction in FY 86 resources and the sequestered funds would carry forward as FY 87 budgetary resources to be distributed on October 1, 1986, the beginning of FY 87, subject to FY 87 budget authorizing legislation.

The Comptroller General's opinion provides greater support for our interpretation of Gramm–Rudman–Hollings.

> For trust and special funds appropriated on an annual basis, no expenditures may be made without appropriation action by the Congress. We consider that

requirement to apply as well to funds remaining in such accounts due to the sequestration process of Public Law 99–177.

In those cases in which trust and special funds are appropriated under permanent indefinite appropriations, it is our view that the Congress intended, through the use of such appropriations, to permit the annual payment of receipts and benefits without further congressional action. We do not consider Public Law 99–177 to have changed that basic principle, and therefore consider the relevant permanent appropriations language to be sufficient to cover all funds in the special or trust account, even those funds carried over from prior fiscal years due to the sequestration process of Public Law 99–177. *Thus, "release" of sequestered amounts in the subsequent fiscal year is, in our view, authorized by the permanent appropriations authority applicable to the account in the subsequent fiscal year.* Release of sequestered amounts should be made as part of the ordinary expenditures from such funds *in the subsequent year.*

. . . . .

Unlike OMB, however, we do not view sequestered funds as automatically available as of October 1 of the subsequent year. *The authority to make payments of sequestered funds is the same as the authority generally applicable to funds in the account in the subsequent fiscal year.* As indicated in our earlier letter, most of the permanent appropriations involved require that payments be made at the close of the applicable fiscal year.

Your second question is what effect the release of funds sequestered in trust and special fund accounts at the beginning of the subsequent fiscal year has on the budget deficit for that fiscal year, and how such a release of funds contributes to the deficit-reduction goals of Public Law 99–177. *As indicated above, it is our view that the authority for such a release of funds is not derived from a resurgence of prior year authority (which was reduced under Public Law*

*99–177), but instead from the new or existing authority applicable to the subsequent fiscal year* (either from new annual appropriations or existing permanent indefinite appropriations). Consequently, we consider such amounts to be new budgetary resources subject to sequester in the subsequent fiscal year.

Joint Appendix at 105–06 (emphasis added).

Thus, for the above reasons, we hold that Gramm–Rudman–Hollings' sequestration provision resulted in a reduction of FY 86 budgetary resources and as a result of COBRA's repeal of the Revenue Sharing Act the Secretary had no authority to disburse the sequestered Trust Funds to the local governments.

We deferred ruling on the Motion of Ashland County, Wisconsin, and Shelby County, Kentucky, to be Formally Designated Plaintiffs–Appellees until the conclusion of oral argument. In view of our disposition of the merits no purpose would be served in granting this motion. Accordingly, the motion is denied.

### III. CONCLUSION

To summarize, we believe that the district court possessed subject matter jurisdiction over this case. This case does not involve a Tucker Act claim and the APA's waiver of sovereign immunity for claims seeking relief other than money damages was appropriately invoked by the district court. This case involves a substantial federal question and 28 U.S.C. § 1331 conferred jurisdiction on the district court. Thus we affirm the district court's exercise of jurisdiction.

On the merits, we believe that it was appropriate for the Secretary to transfer funds sequestered in the State and Local Government Fiscal Assistance Trust Fund to the General Fund of the Treasury. Gramm–Rudman–Hollings resulted in a reduction of FY 86 entitlements and carried these amounts over as FY 87 budgetary resources. Congress repealed the Revenue Sharing Program at the completion of the FY 86 entitlement period, thus the Secretary did not have any FY 87 Congressional authority to disburse the sequestered Trust

Funds to the local governments. Accordingly, we reverse the order of the district court.