**STATE OF ALABAMA, et al.,**
Plaintiffs,

v.

**Charles A. BOWSHER, et al.,**
Defendants.

**Civ. A. No. 88–3717.**

United States District Court,
District of Columbia.

March 30, 1990.

Andrew P. Miller, Bernard Nash, Peter J. Kadzik, Dickstein, Shapiro & Morin, Washington, D.C., Joe A. Walters, E. William Crotty, Donald S. Arbour, O'Connor and Hannon, Minneapolis, Minn., and Washington, D.C., for plaintiffs.

Sandra M. Schraibman, Mark H. Murphy, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM DECISION AND ORDER

REVERCOMB, District Judge.

The plaintiffs in this matter are twenty-three States who claim the right pursuant to their respective unclaimed property laws to custody of monies belonging to their respective citizens and contained in the United States Treasury trust fund receipt account "Unclaimed Moneys of Individuals Whose Whereabouts are Unknown" as established by 31 U.S.C. § 1322. The defendants in this matter are the Comptroller General of the United States ("Comptroller General") and the Secretary of the Treasury of the United States ("Secretary"). The plaintiffs seek to compel the Secretary and the Comptroller General to settle their claims for the monies in their favor and to disburse the monies accordingly. The plaintiffs also seek to compel the Secretary to provide information regarding the unclaimed monies.

This matter is before the Court pursuant to defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment. The defendants contend that this action is barred by sovereign immunity, standing, ripeness, failure to state a claim, the Supremacy Clause and exhaustion.

## I. STATUTORY AND ADMINISTRATIVE BACKGROUND

### A. Unclaimed Monies Accounts

The account "Unclaimed Moneys of Individuals Whose Whereabouts are Unknown" is established in 31 U.S.C. § 1322.[1] That provision requires the Secretary to transfer to that account those funds which had been in trust fund accounts listed in 31 U.S.C. § 1321(a)(1)–(82) or analogous trust funds listed in § 1321(b) for more than one year and which represent money belonging to individuals whose whereabouts are unknown.[2] Section 1322 expressly provides

---

**1.** Section 1322 provides:

(a) On September 30 of each year, the Secretary of the Treasury shall transfer to the Treasury trust fund receipt account "Unclaimed Moneys of Individuals Whose Whereabouts are Unknown" that part of the balance of a trust fund account named in section 1321(a)(1)—(82) of this title or an analogous trust fund established under section 1321(b) of this title that has been in the fund for more than one year and represents money belonging to individuals whose whereabouts are unknown. Subsequent claims to the transferred funds shall be paid from the account "Unclaimed Moneys of Individuals Whose Whereabouts are Unknown."

(b) Except as provided in subsection (c) of this section, necessary amounts are appropriated to the Secretary to make payments from—

(1) the Treasury trust fund receipt account "Unclaimed Moneys of Individuals Whose Whereabouts are Unknown"; and

(2) the United States Government account "Refund of Moneys Erroneously Received and Covered" and other collections erroneously deposited that are not properly chargeable to another appropriation.

Subsection (c)(1) of § 1322 references unclaimed Postal Savings Systems deposits and provides that the Secretary shall hold in the "Unclaimed Moneys" account "the balance remaining after the final distribution of unclaimed Postal Savings System deposits" and that balance shall be used "to pay claims for Postal Savings System deposits without regard to the State law or the law of other jurisdictions of deposit concerning the disposition of unclaimed or abandoned property."

**2.** 31 U.S.C. § 1321(a)(1)–(82) includes such diverse sources of funds as (9) Library of Congress trust fund, investment account; (14) wages and effects of American seamen, Department of Commerce; (23) Pay of the Navy, deposit funds; (40) Petersburg National Military Park fund; (43) wages due American seamen; (53) unclaimed condemnation awards, Rock Creek and Potomac Parkway Commission; (67) Miscellaneous trust funds of Indian tribes.

Section 1321 does not include those funds from which the large majority of federal benefit

that subsequent claims to those monies are to be paid from that account and that necessary amounts will be appropriated for payment of those claims.

The Treasury Department has designated two funds to receive deposits of monies deemed unclaimed pursuant to 31 U.S.C. § 1322. Trust fund account number 20X6133 serves as a depository for monies in the amounts of $25.00 or more which meet certain criteria, and miscellaneous receipt account number 1060 serves as a depository for monies in amounts of less than $25.00 and for those monies which do not otherwise meet the criteria for transfer into Account 20X6133.[3] *See* 1 Treasury Financial Manual ("TFM") § 6–3030.

The separate accounts were created to facilitate bookkeeping by the Treasury. Account 1060 is a true "miscellaneous receipts" account; deposits made into this account (unlike Account 20X6133) are not directly available for disbursement. In the event that claims are received by the transferring agencies for items transferred to Account 1060, and the facts indicate that refunds are justified, such claims are paid from account 20X1807 ("Refund of Moneys Erroneously Received and Covered") in accordance with the provisions of 1 TFM § 6–3075.

**B. Procedures for Transfer of Unclaimed Monies Into the Secretary's Custody**

The Secretary directs the federal agencies to analyze their various trust, revolving and deposit accounts periodically to determine whether they are holding unclaimed monies and, if so, to take appropriate action to initiate the transfer of such monies to the "unclaimed moneys" accounts. 1 TFM § 6–3030. Although the Treasury Department serves a centralized role as custodian of government funds, it has neither the access to agency records necessary to determine which monies have been held for over one year in the agency accounts nor certifying authority to order the transfer of monies from those accounts to the unclaimed monies accounts. Agencies transfer monies into the unclaimed monies accounts by submitting either a Statement of Transaction (Standard Form 224) or its electronic equivalent. 1 TFM § 6–3040.

The Treasury Department, through its Financial Management Service ("FMS"), maintains only the cumulative or government-wide balance of the unclaimed monies accounts, which reflects the monthly composite balance of deposits and withdrawals. The FMS maintains no records about the nature or origin of any monies transferred into the unclaimed monies accounts by the various agencies, including those within the Treasury Department (*e.g.*, Internal Revenue Service, Bureau of Public Debt). Any such records would be maintained exclusively by the various agencies themselves. 1 TFM § 6–3085. The exact nature of these records may vary from agency to agency. The FMS has no independent knowledge of the internal accounting practices of any other agency or bureau concerning unclaimed monies and has no government-wide auditing function.

**C. The Claims–Payment Scheme**

Accountability for public monies in civilian agencies generally rests with the certifying official of the transferring agency, who has been charged with the responsibility of reviewing, *inter alia*, the "information stated in the certificate, voucher, and supporting records ... [and] the legality of a proposed payment under the appropriation or fund involved" and, if appropriate,

---

payments are made. Many of those funds are subject to statutes which specifically provide for the retention or other disposition of unclaimed benefit payments. *See, e.g.,* Federal Employees Life Insurance Benefit Fund, 5 U.S.C. § 8705(d); Civil Service Retirement Fund, 5 U.S.C. § 8345(i); Federal Old–Age and Survivors Insurance Fund, 42 U.S.C. § 401(m); and Railroad Retirement Fund, 45 U.S.C. § 231.

**3.** Transfer of monies into Account 20X6133 must meet the following criteria: "(a) amount of $25.00 or more; (b) a refund, upon a claim, would be absolutely justified; (c) there is no doubt as to legal ownership of the funds; (d) a named individual business, or other entity can be identified with the item." 1 TFM § 6–3040.10.

certifying vouchers for payment. 31 U.S.C. § 3528; *see also* 1 TFM §§ 6–3060, 3075. If the certifying official has a question regarding the legality or propriety of the claim—and if Congress has not vested claims settlement in that administrative agency—the agency can submit the matter to the General Accounting Office. 1 TFM § 6–3050; *see also* GAO Policy and Procedures Manual for Guidance of Federal Agencies, title 7, § 21.11 (1983).[4]

Should the transferring agency determine that the claim for monies is legal and proper, the certifying official will initiate payment through the certification of a Voucher and Schedule of Payment Standard Form 1166 or its electronic certification equivalent. 1 TFM § 6–3060. This payment voucher is then transmitted to a disbursing official, who for most civilian Executive Branch agencies is an employee or official of the Treasury Department.[5] 31 U.S.C. § 3321(a). Since the Secretary's authority to act as disbursing official is expressly limited by 31 U.S.C. § 3321(a) to executive agencies, the Legislative and Judicial Branch agencies have their own disbursing authority. *See* 2 U.S.C. § 104a (House of Representatives); 2 U.S.C. §§ 142b, d, e (Library of Congress); 2 U.S.C. § 143 (Architect of the Capitol); 28 U.S.C. § 604(a)(8) (Administrative Office of the U.S. Courts).

Pursuant to 31 U.S.C. § 3325(a), "[a] disbursing official in the executive branch of the United States Government shall (1) disburse money only as provided by a voucher certified by (A) the head of the executive agency concerned; or (B) an officer or employee of the executive agency having written authorization from the head of the agency to certify vouchers." For those agencies for which Treasury Department officials are the disbursing officials, vouchers are sent by the transferring agencies to FMS' Regional Financial Centers instructing payments according to the information contained in the vouchers. The disbursing officials do not review the vouchers to determine the legality or propriety of the underlying claims but, rather, the Regional Financial Centers examine the vouchers to determine if they are in the proper format, have been duly certified and are correctly computed. 31 U.S.C. § 3325(a)(2). The FMS then mails out the payments to the address contained on the form. The Agency Confirmation Report is transmitted to the finance office of the transferring agency as a record of payment.[6] The other agencies which have both certifying and disbursing authority will issue their own payments and notify the Treasury Department of the composite monthly balance. 1 TFM §§ 6–3060, 3075.

4. Pursuant to 31 U.S.C. § 3702, the Comptroller General is authorized to "settle all claims of or against the United States." The term "settlement" applies not in the compromise sense, but "has been used from the beginning to describe administrative determination of the amount due." *Illinois Surety Co. v. United States ex rel. Peeler*, 240 U.S. 214, 219–22, 36 S.Ct. 321, 323–24, 60 L.Ed. 609 (1916). "A claim for purposes of GAO's claims settlement authority means a monetary claim—a claim for the payment of money. Without specific statutory authority GAO is not authorized to consider claims for equitable relief, such as specific performance ... or the recrediting of sick leave...." *GAO, Principles of Federal Appropriations Law* at 11–8 (1982).

In recognition that Congress has in certain instances vested other agencies with authority to settle claims, GAO regulations provide claims procedures at 4 C.F.R. Part 31 which apply "to all classes of claims by and against the United States except: (a) Those claims which are under the exclusive jurisdiction of administrative agencies pursuant to specific statutory authority." 4 C.F.R. § 30.1. GAO has also in certain instances limited its jurisdiction on certain claims, including claims for monies filed in Accounts 20X6133 and 1060.

5. By statute, however, the disbursing officials for the United States Marshal's Office and the "military departments of the Department of Defense (except for disbursements for departmental pay and expenses in the District of Columbia)" are not Treasury Department employees but, rather, are agency employees designated by the heads of those particular agencies. 31 U.S.C. § 3321(c).

6. Disbursal of monies from Account 1060 differs from the above-discussed procedures only to the extent that claims for monies deposited into Account 1060 must be paid from Account 20X1807, "Refund of Money Erroneously Received and Covered." *See* 1 TFM §§ 6–3070, 3075.

Payment of claims for monies in accounts 20X6133 or 1060 are not made through direct contact between the claimant and the FMS (unless the FMS also is the transferring agency for the particular monies claimed). Nor are payments from these accounts made by the General Accounting Office. They are made upon authorization of the individual agencies without claims settlement action by GAO. 1 TFM §§ 6–3050, 3060, 3075; *see also* GAO Policies and Procedures for Guidance of Federal Agencies, Title 7, § 21.11. The Treasury Department is not aware of the procedural requirements of other agencies or bureaus for perfecting claims, nor does the Treasury Department set out procedures for determining whether a claim is valid and recoverable.[7]

### D. Plaintiffs' Contacts with the Defendants and the Transferring Agencies

None of the plaintiff States claim to have escheated the monies they seek, that is, to have obtained legal title to or actual ownership of the monies through due process procedures which divest the owners of their interests therein. The plaintiff States have not filed claims for custody of monies contained in the unclaimed monies accounts with the transferring agencies.[8] Indeed, the plaintiff States have not even contacted the transferring agencies for information on how to proceed or for the identification of unclaimed monies which belong to the citizens of their respective States.

On December 14, 1988, six States, Arizona, Delaware, Illinois, Kansas, Kentucky and Pennsylvania, sent a letter to the Comptroller General which requested: (1) "an acknowledgment that the states have a valid claim" to unspecified monies in the unclaimed monies accounts; (2) a listing of existing trust funds from which the monies had been transferred and of the amounts transferred, as well as the identities of the transferring agencies; (3) "A listing of any procedures, administrative or otherwise,

---

**7.** The plaintiffs fail to dispute the existence of the administrative scheme detailed in the Treasury Financial Manual and upon which the defendants extensively rely in compiling their Rule 108(h) statement. Indeed, the plaintiffs completely ignore the TFM in their own Rule 108(h) statement and in their *Opposition to Defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment* (*"Opposition to Defendants' Motion"*). Rather, the plaintiffs contend that this administrative scheme is inconsistent with § 1322 or, in the alternative, that they are not required to comply with it pursuant to their state unclaimed property laws and the Tenth Amendment. However, these are legal issues and not factual disputes. Accordingly, this Court has deemed admitted all facts identified in defendants' Rule 108(h) statement which the plaintiffs have specifically failed to controvert.

The thrust of *Plaintiffs' Statement of Material Facts in Genuine Dispute* is legal and not factual. For example, plaintiffs contend that "[t]here are no administrative procedures plaintiffs must exhaust to obtain monies held by the Secretary of the Treasury in the unclaimed monies accounts" and "[i]f such procedures do exist, the States are not required to comply with federal administrative procedures applicable to individual claimants in order for the States to recover the monies pursuant to their unclaimed property statutes." *Id.* ¶¶ 6, 7. However, whether the plaintiffs must exhaust the administrative scheme established by the Secretary in the TFM to obtain the unclaimed monies or whether they can rely on their unclaimed property laws is precisely the legal issue at the center of this case. Plaintiffs' *Opposition to Defendants' Motion* expressly provides:

This is not a complicated lawsuit. The issues are basic and straightforward. The question to be resolved is whether the Secretary, as a holder of unclaimed property as defined under the States' unclaimed property laws, must comply with these laws like any other holder. *Id.* at 7. This Court fully agrees with plaintiffs that "[t]his is a *legal dispute* over the right to unclaimed funds that have been transferred to the unclaimed monies accounts." *Id.* at 49 (emphasis added).

The few actual facts which the plaintiffs recite as in dispute are not material to a determination of this case.

**8.** The Treasury Department has identified seventeen agencies which have transferred monies into Accounts 20X6133 and/or 1060 since 1984. Those agencies include the U.S. House of Representatives, Architect of the Capitol, Library of Congress and Administrative Office of the U.S. Courts, all of which have their own disbursing authority; three military departments (Army, Navy and Air Force) which also have their own disbursing authority, with certain limited exceptions, *see* 31 U.S.C. § 3321; and the following civilian Executive Branch agencies for which Treasury officials act as disbursing officers: The Departments of Agriculture, Commerce, Energy, Health and Human Services, Interior, Justice, Labor, Transportation, Treasury, and Veterans Affairs.

that the states must complete in order to perfect their claims;" and (4) "assurances" that the monies would not be disbursed except to the "lawful owners of the moneys or their respective states of residence." The States threatened to sue if they did not "receive an acknowledgment of the validity of their claim asserted herein" within two weeks.

On December 30, 1988, the six States, plus the State of Rhode Island, filed the instant action.

On January 3, 1989, Gary L. Kepplinger, Associate General Counsel of the GAO, responded to the December 14, 1988 letter. Kepplinger stated that although GAO "has the statutory authority to settle claims against the United States," such claims "usually involve a claim for a specific amount due." He noted that the December 14 letter, in contrast, "merely requests a general acknowledgment or declaration of your clients' rights and status *vis-a-vis* funds in the unclaimed moneys account as well as the necessary information to perfect your clients' claims. Such a declaratory action is beyond the realm of the [GAO's] claims settlement jurisdiction." Kepplinger further stated that payments from the "unclaimed moneys account" are made "without settlement action by GAO." GAO would only consider such claims "in those cases where the Treasury Department or other agency questions the legality or propriety of any claim."

After the instant suit was filed, five of the plaintiff States (Arizona, Illinois, Kansas, Nevada and Utah) sent letters to Bettsy H. Hettinger, the Director of the Cash Management Division of the Financial Management Service at Treasury, requesting her, in effect, to "search her records for, and produce a listing of, unclaimed property in the custody of federal agencies which are the property of residents of their States." One of the States, Nevada, also asked that Hettinger "report and remit" the monies listed to the State's Unclaimed Property Division. Hettinger replied to the five States, by letter dated April 24, 1989, that "FMS does not maintain any record of these deposits other than a cumulative dollar figure. The depositing agencies retain the only supporting documentation necessary to identify these funds." Hettinger advised the States that "[i]n order to file claims on any of these funds, you will need to contact the individual agencies believed to be holding funds payable to your residents."

On April 10, 1989, the complaint was amended to add as plaintiffs Alabama, Hawaii, Minnesota, Ohio, Nevada, South Dakota and Utah. On October 6, 1989, the complaint was amended to add as plaintiffs Florida, Iowa, Louisiana, Missouri and Oklahoma. On December 29, 1989, the complaint was amended to add as plaintiffs Montana, New Hampshire, West Virginia and Wisconsin.

## II. SOVEREIGN IMMUNITY

The defendants contend that the instant action is barred by the doctrine of sovereign immunity where the plaintiffs seek, *inter alia,* to compel the defendants to disburse funds in the possession of the federal government and to disburse information. *See Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963); *Stafford v. Briggs,* 444 U.S. 527, 542 n. 10, 100 S.Ct. 774, 784 n. 10, 63 L.Ed.2d 1 (1980). The defendants contend the plaintiffs "must establish that the United States has waived its immunity with respect to this type of lawsuit." *State of Florida v. United States Dep't of the Interior,* 768 F.2d 1248, 1253 (11th Cir.1985), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986); *see also United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976).

■ Congress has expressly waived sovereign immunity in suits seeking equitable relief against the federal government in section 702 of the Administrative Procedure Act ("APA") which provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An

action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States.

5 U.S.C. § 702.[9]

Although the instant suit is not brought under the APA, the caselaw of this circuit confirms that "the waiver applies to any suit, whether under the APA, [28 U.S.C.] § 1331, § 1361, or any other statute." P. Bator, P. Mishkin, D. Meltzer & D. Shapiro, *Hart and Wechsler's The Federal Courts and The Federal System* 1154 (3d ed. 1988); *see, e.g., National Ass'n of Counties v. Baker,* 842 F.2d 369, 373 (D.C.Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 784, 102 L.Ed.2d 775 (1989) (section 702 waived sovereign immunity in action to compel the Secretary to disburse certain appropriated funds); *Schnapper v. Foley,* 667 F.2d 102 (D.C.Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982) (section 702 waived sovereign immunity in copyright case); *Sea-land Service, Inc. v. Alaska R.R.,* 659 F.2d 243, 244 (D.C.Cir.1981), *cert. denied,* 455 U.S. 919,

102 S.Ct. 1274, 71 L.Ed.2d 459 (1982). The issue of whether section 702 acts as a waiver to actions other than those brought under the APA was definitively put to rest by the Supreme Court in *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). In *Bowen v. Massachusetts,* the State of Massachusetts brought suit in federal court, invoking 28 U.S.C. § 1331, to challenge a decision by the Secretary of Health and Human Services disallowing reimbursement for certain State expenditures for mental health services under 42 U.S.C. § 1316(d). The Court expressly held that section 702 operated as a waiver of sovereign immunity to judicial review of the action brought by the State challenging the Secretary's disallowance decision. *Id.* 108 S.Ct. at 2731.

The defendants nonetheless contend that the terms of the waiver in section 702 do not apply to the instant action because the plaintiffs cannot demonstrate that they have been wronged by final agency action.[10] The defendants argue that there is no final agency action which has wronged the plaintiffs because they have failed to apply to the transferring agencies who are the necessary parties to act upon plaintiffs' claims. The defendants contend that if the plaintiffs made such action, then they very well might obtain the relief that they seek.

As a threshold matter, the defendants are essentially conflating their sovereign

---

9. Section 702 applies to all equitable actions "except to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

10. Although the plaintiffs are seeking the disbursement of monies in the possession of the federal treasury, the defendants do not dispute that under section 702 this relief constitutes equitable rather than money damages. In *Bowen v. Massachusetts,* the Court held that a transfer of federal monies to Massachusetts as reimbursement for its expenditures would not constitute money damages. 108 S.Ct. at 2740. The Court distinguished an award of money used as specific relief from an award of "money damages":

"We begin with the ordinary meaning of the words Congress employed. The term 'money damages,' 5 U.S.C.A. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.' D. Dobs, *Handbook on the Law of Remedies* 135 (1973). Thus, while in many instances an award of money is an award of damages, '[o]ccasionally a money award is also a specific remedy.' *Id.* Courts frequently describe equitable actions for monetary relief under a contract in exactly those terms."

*Id.* at 2732–33 (emphasis in original) (quoting *Maryland Dep't of Human Resources v. Department of Health and Human Servs.,* 763 F.2d 1441, 1446 [D.C.Cir.1985] ). This Court cannot imagine any claim for monies which could be more equitable in nature than the instant case where the plaintiffs are seeking specific monies within the unclaimed monies accounts which they claim they are entitled to under their state law.

immunity argument with their exhaustion argument.[11] The problem with the defendants' position is that it ignores the very premise of the lawsuit, namely, that the plaintiffs contend they do not have to apply to the separate agencies but can proceed directly against the defendants for relief. The defendants have apprised the plaintiffs that they will not directly act upon the plaintiffs' claims and this is precisely the agency action that the plaintiffs claim is harming them. The defendants do not contend that there are any other procedures other than through judicial review by which the plaintiffs can challenge the defendants' requirement that the plaintiffs apply to the transferring agencies.

■ More fundamentally, however, the defendants' argument is premised on the view that the waiver of sovereign immunity in section 702 only applies to final "agency action" defined in 5 U.S.C. § 551(13) as "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." In light of the plain broadsweeping language of the waiver of sovereign immunity and its clear legislative history, this Court does not accept the defendants' argument.[12]

In *The Presbyterian Church v. United States*, 870 F.2d 518, the court addressed the precise argument which the defendants are making in the instant case, namely, that § 702's waiver of sovereign immunity applies only to "agency action" as defined by the APA. The court squarely rejected that argument, holding:

> Nothing in the language of the amendment suggests that the waiver of sovereign immunity is limited to claims challenging conduct falling in the narrow definition of "agency action"....
>
>     *    *    *    *    *    *
>
> Moreover, nothing in the legislative history of the 1976 amendment of § 702 suggests that Congress intended to limit the waiver of sovereign immunity to the specific forms of "agency action" enumerated in § 551(13). On the contrary, Congress stated that "the time [has] now come to eliminate the sovereign immunity defense in *all* equitable actions for specific relief against a Federal agency or officer acting in an official capacity." [Citation omitted.] * * * This waiver was clearly intended to cover the full spectrum of agency conduct, regardless of whether it fell within the technical definition of "agency action" contained in § 551(13).

*Id.* at 525. The defendants make no effort to challenge or distinguish *Presbyterian Church* and this Court accepts its holding and rationale as persuasive.

■ Accordingly, this Court rules that the plaintiffs' action is not barred by the doctrine of sovereign immunity because section 702 expressly waives that immunity.[13]

---

**11.** One of the reasons for the enactment of the sovereign immunity waiver in section 702 was to eliminate misplaced reliance on sovereign immunity as a means of foreclosing judicial review of a particular government activity:

> The need to channel and restrict judicial control over administrative agencies, Congress concluded, could be better achieved through doctrines such as statutory preclusion, exhaustion, and justiciability, rather than through "the confusing doctrine of sovereign immunity." [Citation omitted.] Accordingly, § 702 was designed to "eliminate the defense of sovereign immunity as to any action in a Federal court seeking relief other than money damages and stating a claim based on the assertion of unlawful official action by an agency or by an officer or employee of the agency." [Citation omitted.]

*The Presbyterian Church v. United States*, 870 F.2d 518, 524 (9th Cir.1989).

**12.** Accordingly, this Court does not need to decide whether the defendants' refusal to directly act upon plaintiffs' request for relief constitutes "agency action" within the meaning of § 551(13).

**13.** The plaintiffs further contend that even if there were no express waiver, the doctrine of sovereign immunity does not bar actions which seek the disbursement of federal monies owed to others. However, "[a]lthough plaintiffs' position that they are not suing for the government's money may have some logical appeal, it has been argued and rejected many times before." *Brockelman v. Brockelman*, 478 F.Supp. 141, 142, 143 (D.Kan.1979) (court rejected argument that sovereign immunity does not attach where "the plaintiffs seek not money belonging to the government, but instead money belonging to the defendants which is merely in the hands of the government"); *see also Buchanan v. Alexander*, 45 U.S. (4 How.) 20, 20–21, 11 L.Ed. 857 (1846)

## III. STANDING

The defendants further contend that this court is without jurisdiction to hear this action because the plaintiffs lack standing.

■ The requirement of standing is premised on "Article III of the Constitution [which] confines the federal courts to adjudicating actual 'cases' and controversies.'" *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Standing is necessary to the jurisdiction of this Court to hear this matter. *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975) (whether a plaintiff "has made out a 'case or controversy ... within the meaning of Article III ... is the threshold question in every federal case, determining the power of the court to entertain suit.").

The Supreme Court has developed a three-prong model by which to assess Article III standing. A plaintiff must allege: (1) a "personal injury" that is (2) "fairly traceable to the defendant's allegedly unlawful conduct," and (3) which is "likely to be redressed by the requested relief." *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324; *see also Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Dellums v. United States Nuclear Regulatory Comm'n,* 863 F.2d 968 (D.C.Cir.1988). The court should apply the three factors to the facts at hand with the following questions in mind: "Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?" *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325.

■ The burden of establishing standing is on the plaintiff. More fully,

the Court must accept as true all material allegations of the complaint and construe it in favor of plaintiffs, and it may consider matters extrinsic to the complaint itself deemed supportive of plaintiffs' standing. [Citation omitted.] If however, the facts alleged do not permit a reasonable inference that defendants' putatively unlawful conduct caused the harm, or that if the relief requested is

("So long as money remains in the hands of a disbursing officer, it is as much the money of the United States as if it had not been drawn from the treasury."); *Haskins Bros. & Co. v. Morgenthau,* 85 F.2d 677, 681 (D.C.Cir.), *cert. denied,* 229 U.S. 588, 57 S.Ct. 118, 81 L.Ed.433 (1936) (monies which come into the "possession of the United States charged with a trust ... are nevertheless public monies ... which the United States are charged with the duty of conserving").

The plaintiffs cite *United States v. Klein,* 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840 (1938), as support for the proposition that the fact that the property at issue is in federal custody does not, under the doctrine of sovereign immunity, preclude a party from bringing a suit for its recovery. In *United States v. Klein,* the Court held that the Pennsylvania state courts could, under the State's escheat statutes, declare an escheat of bonds that had been paid into the registry of a federal district court by a third party and subsequently transferred to the United States treasury. The basis of the Court's rationale upholding the constitutionality of the escheat provisions was twofold. First, the government did not claim that it had any right, title or interest in the funds or that the funds could otherwise escheat to the United States. *Id.* at 280, 58 S.Ct. at 538. More fundamentally, however, the Supreme Court expressly noted that the escheat proceeding was *not* an action for the recovery of the funds from the federal government but was simply a proceeding to declare title to the funds:

The present decree for escheat of the fund is not founded on possession and does not disturb or purport to effect the Treasury's possession of the fund or the district's authority over it. Nor could it do so. [Citations omitted.] At most the decree of the state court purports to be an adjudication upon the title of the unknown claimants in the fund ... [citations omitted], and to confirm the authority of [the State] to make claim to the moneys. *Id.* at 282, 58 S.Ct. at 539. In order to actually recover the funds (and hence disturb the Treasury's possession), the State to whom the funds had escheated would have to petition the district court for an order that the moneys be paid to the State. Accordingly, the escheat statutes which were at issue in *United States v. Klein* did not even purport to be an action for the recovery of funds from the federal treasury. Whether the funds were ever in fact removed from the federal treasury was not a function of the independent escheat proceedings in the state courts but a function of the district court's exclusive jurisdiction to dispose of the bonds which it had earlier ordered deposited into its registry. *Id.* at 281, 58 S.Ct. at 538.

afforded the injury will be rectified, standing has not been shown, and the complaint must be dismissed.

*Khalef v. Regan,* 85–1 U.S. Tax Cas. (CCH) ¶ 9269 (D.D.C.1985), *aff'd,* No. 85–5274 (D.C.Cir. Sept. 19, 1986); *see generally Fulani v. Brady,* 729 F.Supp. 158 (D.D.C. 1990).

### A. Injury

■ The defendants claim that the plaintiffs can demonstrate no injury because "[t]hey have not received a determination from the defendants that they are not entitled to the monies they seek." *Defendants' Motion for Judgment* at 30. More specifically, the defendants are contending that until the plaintiffs have exhausted their administrative remedies they cannot claim injury. However, such a position fundamentally mischaracterizes the plaintiffs' claims where the plaintiffs are contending that the defendants' directive to apply to the transferring agencies and to exhaust those administrative remedies is the precise injury of which they complain in the instant case as undermining their state unclaimed property laws. "It is common ground that States have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code.'" *Alaska v. United States Department of Transportation,* 868 F.2d 441, 443 (D.C.Cir.1989) (State granted standing where injury asserted is improper federal preemption of State consumer protection statutes) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 601, 102 S.Ct. 3260, 3265, 73 L.Ed.2d 995 (1982)).

The plaintiffs contend that under their unclaimed property laws they are entitled to proceed directly against the Secretary as "holder" of those funds and to compel the Comptroller to settle their claims.[14] More specifically, the plaintiffs contend that the defendants, as "holders" under their unclaimed property laws, have failed to provide a report identifying the owners of the unclaimed monies [15] and to disburse to the plaintiffs all specific monies which they are entitled to hold as custodians.[16] There is no dispute that the defendants will neither

---

**14.** The States' unclaimed property statutes define a "holder" as any person who is in possession of property belonging to another, is a trustee, or is indebted to another on an obligation. The statutes' definition of "person" includes governmental or political subdivisions. *See* Ala. Code § 35–12–21 (1975); Ariz.Rev.Stat.Ann. § 44–301 (Cum.Supp.1989); 12 Del.Code Ann. § 1198 (1987); Haw.Rev.Stat. § 523A–1 (1985); Ill.Ann.Stat. ch. 141, ¶ 101 (Smith–Hurd 1986); Iowa Code § 556.1 (Supp.1989); Kan.Stat.Ann. § 58–3901 (1983); Ky.Rev.Stat.Ann. §§ 393.010, 393.068 (Michie 1984); La.Rev.Stat.Ann. § 9:152 (West Supp.1989); Mo.Rev.Stat. § 447.503 (Supp.1989); Nev.Rev.Stat. §§ 120A.080, 120A.110 (1986); Okla.Stat. tit. 60, § 651 (1971); 72 Pa.Cons.Stat.Ann. § 1301.1 (Purdon Supp. 1989); R.I.Gen.Laws § 33–21.1–1 (Cum.Supp. 1989); S.D. Codified Laws Ann. § 43–41A–1 (supp. 1989); and Utah Code Ann. § 78–44–2 (1987).

**15.** *See* Ala.Code § 35–12–31 (1977); Ariz.Rev. Stat.Ann. § 44–317 (1987); 12 Del.Code Ann. § 1199 (1987 & Cum.Supp.1988); Haw.Rev.Stat. § 523A–17 (1985 & Supp.1988); Ill.Ann.Stat. ch. 141, ¶ 111 (Smith–Hurd 1986 & Cum.Supp. 1989); Iowa Code § 556.11, *amended by* Iowa Senate File 407, 73d General Assembly (effective July 1, 1989); 1989 Kan.Sess.Laws Ch. 170, § 9; Ky.Rev.Stat.Ann. § 393.110 (Michie Cum.Supp. 1988); La.Rev.Stat.Ann. § 9:168 (West Supp. 1989); Mo.Rev.Stat. § 447.539, *amended by* Mo.

House Bill No. 506, 85th General Assembly (effective August 28, 1989); Nev.Rev.Stat. §§ 120A.250 to 120A.260 (Cum.Supp.1989); Okla.Stat. tit. 60, § 661 (1971 & Supp.1989); 72 Pa.Cons.Stat.Ann. § 1301.11 (Purdon Supp. 1989); R.I.Gen.Laws § 33–21.1–17 (Cum.Supp. 1989); S.D. Codified Laws Ann. §§ 43–41A–19 to 43–41A–21 (1983 & Supp.1989); and Utah Code Ann. § 78–44–18 (1987).

**16.** Holders have a duty under the States' statutes to remit the unclaimed property of which they are in possession to the States. *See* Ala.Code § 35–12–33 (1975); Ariz.Rev.Stat.Ann. § 44–319 (Cum.Supp.1989); 12 Del.Code Ann. § 1201 (1987 & Cum.Supp.1988); Haw.Rev.Stat. §§ 523A–19, 523A–53 (1985 & Supp.1988); Ill. Ann.Stat. ch. 141, ¶ 113 (Smith–Hurd 1986 & Cum.Supp.1989); Iowa Code § 556.13, *amended by* Iowa Senate File 407, 73d General Assembly (effective July 1, 1989); Kan.Stat.Ann. § 58–3914 (1983); Ky.Rev.Stat.Ann. § 393.110 (Michie Cum.Supp.1988); La.Rev.Stat.Ann. § 9:170 (West Supp.1989); Mo.Rev.Stat. § 447.543, *amended by* Mo. House Bill No. 506, 85th General Assembly (effective August 28, 1989); Nev.Rev.Stat. § 120A.320 (Cum.Supp. 1989); Okla.Stat. tit. 60, § 663 (1971 & Supp. 1989); 72 Pa.Cons.Stat.Ann. § 1301.13 (Purdon Supp.1989); R.I.Gen.Laws § 33–21.1–19 (Cum. Supp.1989); S.D. Codified Laws Ann. § 43–41A–27 (1983 & Supp.1989); and Utah Code Ann. § 78–44–20 (1987).

identify the owners of the unclaimed monies nor disburse the monies to plaintiffs without a certifying voucher from the transferring agency to which the defendants contend the plaintiffs must apply.

### B. Causation

■ The defendants further contend that even if the plaintiffs could demonstrate an injury, they fail to meet the causation requirement because the "plaintiffs cannot credibly claim that 'but for' the alleged actions of the defendants, they would have received the monies, since the initial decision whether plaintiffs' claims should be paid rests with independent third parties that are not parties to this action." *Defendants' Motion for Judgment* at 31–32. Again, however, the defendants are not comprehending the thrust of the plaintiffs' complaint which is that they do not have to apply to those independent third parties for the relief that they seek. In other words, the plaintiffs are claiming that as a matter of state law the defendants are the precise parties who should, in the first and final instance, make the decision whether the plaintiffs claims should be recognized and the monies disbursed accordingly.

### C. Redressability

■ Finally, the defendants contend that the plaintiffs cannot establish the redressability requirement of standing. Specifically, the defendants contend that Congress has set up a statutory scheme whereby the Secretary has no authority to disburse monies for four of the transferring agencies (House of Representatives, Library of Congress, Architect of the Capitol and Administrative Office of the U.S. Courts), no authority to disburse for the Departments of Navy, Army and Air Force (with limited exceptions), and no authority to disburse monies without a certified voucher from the remaining transferring agencies. The defendants contend that this Court cannot order them to comply with the plaintiffs' proposed relief because to do so would require the defendants to circumvent the statutory scheme as established by Congress.

The defendants rely upon *Haskins Bros. & Co. v. Morgenthau*, 85 F.2d 677 (D.C.Cir. 1936), where the court held that the defendants "duties are to receive and preserve the public money and not to disburse it except conformably to law" and that accordingly "[w]e know of no power in this or any other court to compel the Secretary of the Treasury or the Treasurer of the United States, in a suit brought against them in their official capacities, to pay out money in the treasury in a manner contrary to that directed by Congress." *Id.* at 680–81; *see also Royal Indemnity Co. v. United States*, 313 U.S. 289, 294, 61 S.Ct. 995, 996, 85 L.Ed. 1361 (1941); *Fansteel Metallurgical Corp. v. United States*, 145 Ct.Cl. 496, 172 F.Supp. 268, 270 (1959).

Obviously this Court can do no more than order the defendants to comply with the law but the very question begged is whether the defendants' interpretation of the statutory scheme for the disbursement of unclaimed monies under § 1322 is correct. If the defendants' interpretation of the statutory scheme is incorrect then this Court can order the defendants to comply with it and to enact regulations accordingly. *See Center for Auto Safety v. National Highway Traffic Safety Administration*, 793 F.2d 1322, 1334 (D.C.Cir.1986) (standing granted to consumer organizations challenging new fuel economy standards for cars because injury, the lack of fuel efficient vehicles, would be redressed by ruling requiring increased fuel efficiency); *Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 936–39 (D.C.Cir. 1986) (plaintiffs challenging Health and Human Services' regulations granted standing since, *inter alia*, a court-ordered change in the regulations at issue would redress their injury). Furthermore, even assuming that the defendants' interpretation is correct, the plaintiffs' alternatively challenge its constitutionality under the Tenth Amendment. This Court certainly has the power to strike down the statutory and administrative scheme relied upon by the defendants if it in fact violates the Tenth Amendment. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176–80, 2 L.Ed. 60 (1803).

Accordingly, this Court rules that the plaintiffs have standing to bring this action.

## IV. RIPENESS

The basic rationale for the ripeness doctrine is

to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Courts determine ripeness by evaluating "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 148–49, 87 S.Ct. at 1515.

### A. Fitness of Decision for Judicial Review

■ In determining fitness of the issues for review, courts look to "whether the issue presented is a purely legal one, whether consideration of that issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Ciba–Geigy Corp. v. United States Environmental Protection Agency*, 801 F.2d 430, 435 (D.C.Cir.1986). As the Supreme Court has provided, in order to be "ripe for review" the "disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 244, 73 S.Ct. 236, 240, 97 L.Ed. 291 (1952).

The defendants contend that the plaintiffs' action must fail under the ripeness doctrine because "[t]here has been no final agency action by either of the defendants or any other agency on the merits of plaintiffs' entitlement to custody of the monies." *Defendants' Motion for Judgment* at 44. Again, however, such a position ignores the fundamental import of the plaintiffs' claims and essentially begs the question that is presented in this case. Although the defendants correctly represent that there has been no agency decision denying the merits of the plaintiffs' claims of entitlement to the monies, the defendants at the same time claim that they are not the proper parties to make that determination and that the plaintiffs must apply to the transferring agencies. The plaintiffs, on the other hand, contend that they do not have to apply to these transferring agencies and have accordingly filed this suit to compel the defendants to make a determination on and disbursement of the monies to which the States claim they are entitled. Although the defendants contend there are complex factual issues which have never been addressed, i.e., the amounts being claimed, the underlying funds from which those monies have been transferred, and the particular interests of the individual states and of the federal government, before these issues can be addressed it must first be determined *who* should address those issues, namely, the defendants or the transferring agencies. The issue of who must resolve the underlying factual issues is precisely what this matter is all about and is fit for review.

### B. Hardship

■ The defendants contend that when weighing hardship, "the fact that there are available administrative remedies which are not even referred to, much less shown to have been exhausted, is also crucial." However, in the decisions relied upon by the defendants the administrative channels themselves were not being challenged. In the instant case, the plaintiffs are contending that they do not have to comply with the administrative remedies to which the defendants refer. The hardship of requiring the plaintiffs to follow these challenged administrative procedures is twofold. First, as a practical matter, the burden and cost to the plaintiffs of applying to seventeen separate transferring agencies is obviously greater than if the plaintiffs could

apply directly to the defendants for relief. The defendants at the hearing in this matter in fact recognized the increased efficiencies to the plaintiffs if they could compel the defendants to act on their claims.

More fundamentally, however, to require the plaintiffs to comply with the administrative procedures they are challenging as in violation of their unclaimed property laws and the Tenth Amendment would impose on them the very hardship and injury that they are trying to prevent by the filing of this action.

Accordingly, this Court rules that the plaintiffs' complaint is ripe for review. The plaintiffs have established the fitness of the issue for review and have demonstrated that they would suffer hardship if judicial review were denied.

### V. FAILURE TO STATE A CLAIM

■ For purposes of a motion to dismiss, the complaint is to be construed in the light most favorable to the plaintiffs and its allegations taken as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Shear v. National Rifle Ass'n,* 606 F.2d 1251, 1253 (D.C.Cir.1979); *United States v. Kearns,* 595 F.2d 729, 731 (D.C.Cir.1978). As stated by the Supreme Court:

> In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). This Court's inquiry is directed to whether the allegations constitute a statement of a claim under FED.R.CIV.P. 8(a). *Investors Syndicate of America, Inc. v. City of Indian Rocks Beach,* 434 F.2d 871, 879 (5th Cir.1970).

■ The defendants contend that the "[p]laintiffs have failed to allege any duty—statutory or otherwise—on the part of the Secretary to provide the information sought" and to disburse the monies. *De-*

*fendants' Motion for Judgment* at 48. Each of the plaintiff States has an unclaimed property statute which permits it to obtain custody and possession of the funds in the unclaimed monies accounts which are now held by the Secretary and to require the holder of monies to identify the owners. The Amended Complaint, on its face, states that the plaintiffs are seeking relief pursuant to these statutes. The right and capacity of the States to rely upon their unclaimed property laws in a cause of action with respect to property held by the federal government is well-established. *See Roth v. Delano,* 338 U.S. 226, 70 S.Ct. 22, 94 L.Ed. 13 (1949); *Anderson National Bank v. Luckett,* 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944); *United States v. Klein,* 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840 (1938); *United States v. Alabama,* 434 F.Supp. 64 (M.D. Ala.1977).

The defendants' recapitulation of the federal statutory and administrative scheme to support their argument that the plaintiffs have failed to state a claim is again begging the question in this case. The federal statutory and administrative scheme relied upon by the defendants may constitute a defense to the cause of action under the Supremacy Clause or the doctrine of exhaustion but it is not relevant to whether the plaintiffs have stated a claim pursuant to their state unclaimed property laws.

This Court rules that the plaintiffs have stated a claim upon which relief can be granted.

### VI. SUPREMACY CLAUSE

The defendants contend that to require them to comply with the plaintiffs' unclaimed property laws rather than the federal statutory and administrative scheme outlined in Part I of this opinion, *supra,* would violate the Supremacy Clause. The Supremacy Clause of the Constitution provides that "the Laws of the United States which shall be made in Pursuance" of the Constitution "shall be the supreme law of the land." Art. VI, cl. 2. *See City of New York v. Federal Communications Comm'n,* 486 U.S. 57, 108 S.Ct. 1637, 100

L.Ed.2d 48 (1988); *Free v. Bland,* 369 U.S. 663, 666, 82 S.Ct. 1089, 1092, 8 L.Ed.2d 180 (1962) ("[t]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail" and "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield").

The Court's inquiry is "directed toward whether there is a valid federal law, and if so, whether there is a conflict with State law." *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976). Federal law preempts state law

> when Congress, in enacting a federal statute, expresses a clear intent to preempt state law ..., when there is outright or actual conflict between federal and state law ..., where compliance with both federal and state law is in effect physically impossible ..., where there is implicit in federal law a barrier to state regulation ..., where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal laws ..., or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.

*Louisiana Public Serv. Comm'n v. Federal Communications Comm'n,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986) (citations omitted).

### A. Valid Federal Law

There can be no argument that Congress is without authority to place unclaimed monies in the custody of the Secretary. "When the United States disburses its funds or pays its debts, it is exercising a constitutional function." *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943). It makes no difference "whether the United States have the use of this money as they do the ordinary revenues of the government or whether the money represents a trust fund created by Congress and earmarked for a specific purpose. In either

case it is money in the Treasury of the United States as to which the United States has had and have the power to control and disposition." *Haskins Bros. & Co. v. Morgenthau,* 85 F.2d 677, 681 (D.C.Cir.1936). Thus, even for monies which come into "possession of the United States charged with a trust," such monies are "nevertheless public moneys ... which the United States are charged with the duty of conserving." *Id.; see also Buchanan v. Alexander,* 45 U.S. (4 How.) 20, 20–21, 11 L.Ed. 857 (1846) (court rejected creditors' attempt to attach seamen's salaries, holding that even though the monies sought to be garnished are owed to the seamen, "[s]o long as money remains in the hands of a disbursing officer, it is as much money of the United States, as if it had not been drawn from the treasury"); *American Guaranty Corp. v. Burton,* 380 F.2d 789, 791 (1st Cir.1967); *Brockelman v. Brockelman,* 478 F.Supp. 141, 143 (D.Kan.1979).

The plaintiffs challenge the validity of the federal law on two grounds. First, they contend that the defendants have misinterpreted § 1322 to require that the plaintiffs apply to the individual agencies. The plaintiffs contend that the defendants have the authority to disburse the monies without a voucher from the transferring agencies.

Section 1322(a) provides that subsequent claims to unclaimed monies from the transferring agencies will be paid from the unclaimed monies accounts established by the Secretary. However, as plaintiffs recognize, § 1322 does not specify the payment procedure. *Plaintiffs' Opposition* at 35 (this section does not "specif[y] the ultimate disposition of the money"). As the plaintiffs further recognize, "[n]othing in the legislative history or language of Section 1332(a) indicates that Congress intended the establishment of the Treasury trust fund receipt account to provide anything more than bookkeeping convenience and safekeeping for the monies deposited therein." *Plaintiffs' Opposition* at 59.

The principal rationale offered by the plaintiff States for proceeding directly against the Secretary is that under

§ 1322 he is "authorized to make disbursements from this account" and accordingly he does not need a certified voucher from the transferring agency. However, simply because the Secretary may be able to disburse the funds without certifying vouchers from the transferring agencies—an issue which this Court does not need to resolve—does not mean that he is precluded from establishing a scheme whereby he authorizes disbursements only after receiving certified vouchers from the agencies. This scheme is eminently reasonable where the transferring agencies are the ones with the records in the first instance by which to determine which monies they have held for over one year and accordingly which monies to transfer to the unclaimed monies accounts. This Court defers to the Secretary's interpretation of § 1322. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

■ The plaintiffs' challenge of the validity of the statutory and administrative scheme under the Tenth Amendment is meritless. This case does not involve the issue of whether § 1322 preempts states' rights to escheat the monies and all the cases relied upon by the States for this proposition are thus not relevant. *See* footnote 13, *supra* (discussion of *United States v. Klein*, 303 U.S. 276, 58 S.Ct. 536). Rather, the States, relying on their unclaimed property laws, assert a right to obtain *custody* of the monies, hold the monies either in perpetuity or for a specified number of years for the original claimants, and pay any such claims from state-held accounts. *Plaintiffs Initial Response* pp. 3, 12.

**B. Conflict Between State Laws and § 1322**

■ In *State of Utah v. United States of America*, Civil No. NC 80–0079–J (May 29, 1981), the court rejected the State's suit to compel the Secretary of the Treasury to transfer custody of unclaimed tax refunds checks were allegedly deposited in the predecessor account to § 1322. The court held, *inter alia:*

> Congress has established a statutory scheme for the disposition by the United States of unclaimed tax refund checks, thereby preempting the field. Title 31 U.S.C. § 725p provides that all "Unclaimed moneys of individuals whose whereabouts are unknown (Treasury)," including unclaimed federal tax refund checks, are to be covered into a trust fund receipt account in the Treasury to be designated "Unclaimed Moneys of Individuals Whose Whereabouts Are Unknown." Any state law in conflict with the federal statute must fall by virtue of the Supremacy Clause of the U.S. Constitution.

*Id.* at 3. The recodification of Title 31 in 1982 to enact § 1322 into positive law did not diminish the Secretary's custody of the monies.

The plaintiffs contend that *State of Utah* was wrongly decided because there is no evidence—under either § 1322 or its predecessor accounts—that Congress intended for the federal government to maintain custody of the unclaimed monies. However, the *statute itself* authorizes the Treasury to maintain custody of these monies. The plain language and meaning of the statute is the best source of legislative intent and the plaintiffs have found nothing in the legislative history that is plainly inconsistent with the statutory language.[17]

---

**17.** That Congress intended for the Treasury to maintain custody of the funds is apparent in subsequent bills introduced in the 100th Congress which, had they passed, would have effected the same relief that the plaintiffs seek here pursuant to § 1322. *See* S.1612, 100th Cong., 1st Sess. (Aug. 5 (or 6) 1987); H.R. 4298, 100th Cong., 2d Sess. (March 30, 1988). As Senator Hatch, the sponsor of S.1612, noted, his bill, the Unclaimed Property Act of 1987, would require federal agencies to "turn over the [unclaimed] funds to the states rather than the U.S. Treasury." 133 Cong.Rec. S 11492 (Aug. 6, 1987).

Moreover, that Congress intended the Treasury to maintain custody of the monies is all the more apparent when other statutes are examined where Congress expressly authorized the States to obtain custody of unclaimed monies. The same Congress that recodified title 31 and expressly vested custody of certain unclaimed monies in the Secretary pursuant to § 1322 also enacted a provision effecting transfer to the

Therefore, since Congress has the authority to place custody of these monies with the Secretary and has done so without any provision requiring transfer to the States' custody upon request, the Supremacy Clause invalidates any state statutes which can be interpreted as providing for state custody of the monies in Accounts 20X6133 and 1060. Section 1322 clearly places the custodial rights to the monies with the Secretary and since both entities cannot have custody the Supremacy Clause requires that § 1322 take precedent. The states simply cannot claim a superior right to custody.

### C. Supremacy Clause and State Regulation of Federal Agencies

■ The plaintiffs contend that the Secretary is a "holder" of unclaimed property pursuant to their respective unclaimed property laws and therefore he must comply with their reporting and disbursing requirements. *See* Plaintiffs Responses at 6, 9, 13–14, 24. Such contentions, however, are meritless where "it is well established that the doctrine of federal supremacy protects the legitimate activities of the United States Government from regulation by state authorities." *Township of Middleton v. N/E Regional Office, United States Postal Serv.*, 601 F.Supp. 125, 127 (D.N.J. 1985); *see also Hancock v. Train*, 426 U.S. 167, 178, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976); *United States v. Town of Windsor, Connecticut*, 765 F.2d 16, 18 (2d Cir.1985); *Don't Tear It Down, Inc. v. Pennsylvania Avenue Development Corp.*, 642 F.2d 527, 533–34 (D.C.Cir.1980).

State regulation of federal activities is appropriate "only when and to the extent there is 'a clear congressional mandate,' 'specific congressional action' that makes this authorization of state regulation 'clear and unambiguous.'" *Hancock v. Train*, 426 U.S. at 179, 96 S.Ct. at 2012 (state cannot require federal agencies to obtain permits); *see also Don't Tear It Down*, 642 F.2d at 535. This Court can find nothing in 31 U.S.C. § 1322—nor have plaintiffs pointed this Court to anything—which evidences a "clear congressional mandate" authorizing the States to impose the requirements of their unclaimed property laws on the Secretary. Therefore, any reliance on the States' own laws to compel the disbursement of the monies and the production of information must fail.[18]

States' custody of other unclaimed monies being held in the custody of the Comptroller of the Currency. The purpose of the Garn–St. Germaine Depository Institutions Act of 1982, P.L. No. 97–320, 12 U.S.C. § 216, et seq., was "to dispose of unclaimed property in the possession, custody or control of the Comptroller of the Currency," which the Comptroller of the Currency has "acquired from receivers of national banks that failed before and during the pre-WWII Depression." S.Rep. No. 97–536, 1982 U.S.Code Cong. & Adm. News 3054, 3082 (1982). The Act expressly provided that states with unclaimed property laws authorizing them to obtain custody or possession of the property could file a claim: "the term 'claimant' means any person or entity, including a state under applicable statutory law, asserting a demonstrable legal interest in the title to, *or custody and possession* of, unclaimed property." 12 U.S.C. § 216a(3) (emphasis added); *see also* 1982 U.S. Code Cong & Adm.News 3083; 12 C.F.R. § 33.4(a), (f).

Two of the plaintiffs—Illinois and Utah—have acknowledged the need for legislation in order to transfer custody of the monies from the Secretary to the respective States: "The National Association of Unclaimed Property Administrators (NAUPA) will be again submitting legislation that will empower Federal agencies to turn such unclaimed property to the state offices for return to the owners." *See* Letters to Bettsy Hettinger of FMS, (Exh. B).

**18.** In addition to reporting and transfer of custody requirements, most of the plaintiffs' unclaimed property laws also authorize civil and/or criminal penalties for failure of a "holder" to comply. It is ludicrous to imply that Congress intended to subject the Secretary not just to state reporting and disbursing requirements but also to monetary penalties and/or jail for failure to comply. The plaintiffs contend that any assertion that the Secretary would be fined or jailed is speculative.

However, the issue is not whether the plaintiffs would exercise discretion in seeking fines and jail sentences but whether in fact their state law—which plaintiffs contend is binding upon the Secretary—authorizes such penalties. The plaintiffs do not dispute that their laws in fact provide for the imposition of fines and jail terms on "holders"—which the plaintiffs contend the Secretary is—of unclaimed property for failure to comply with their disbursing and reporting provisions. *See* Ala.Code § 35–12–31 through 35–12–33, 35–12–45; Ariz.Rev.Stat. §§ 44–317 through 44–319, 44–334; 12 Del.Code

## VII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

The defendants contend that the State plaintiffs have failed to exhaust their administrative remedies for the disbursement of unclaimed monies where they have failed to apply to the transferring agencies. The plaintiffs concede that they have not directly applied to the transferring agencies but have been contending throughout this litigation that they were not required to under their unclaimed property laws. However, in light of this Court's ruling that the federal statutory and administrative scheme under § 1322 takes precedence over the plaintiffs' unclaimed property laws, the plaintiffs must now exhaust their administrative remedies.

Although the plaintiffs claim that the defendants have failed to identify the specific procedures within each transferring agency by which the plaintiffs must proceed, the undisputed fact is that the defendants themselves are unaware of the agencies' individual procedures for perfecting claims and authorizing vouchers for claimants. Indeed, this is the very reason why the defendants are contending that the plaintiffs must apply to the transferring agencies where these agencies not only have the authority to proceed on the plaintiffs' claims but also possess the information to apprise the plaintiffs on how to proceed.

Accordingly, this Court rules that the plaintiffs have failed to exhaust their administrative remedies and they must contact the particular transferring agency, bureau or office and must comply with its requirements for perfecting a claim.

It hereby is

ORDERED that defendants' Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgement be, and the same hereby is, GRANTED.

Ann. §§ 1199 through 1201, 1207; Ill.Ann.Stat. Ch. 141, ¶¶ 111 through 113, 125; Kan.Stat.Ann. §§ 58–3912 through 58–3914, 58–3926; Minn. Stat. §§ 345.41 through 345.43, 345.55; Nev. Rev.Stat. §§ 120A.250, 120A.280, 120A.290, 120A.320, 120A.440; Ohio Rev.Code Ann §§ 169.03, 169.05, 169.06, 169.99; 72 Pa.Cons. Stat.Ann §§ 1301.11 through 1301.12, 1301.25;

S.D. Codified Laws §§ 43–41A–18 through 43–41A–34, 43–41A–25; and Utah Code Ann. §§ 78–44–18 through 78–44–20, 78–44–36. The plaintiffs do not attempt to deny—consistent with their position that their state laws apply to the defendants—that the plaintiff States could in fact proceed against the defendants with such penalties.