# Investment of Federal Trust Funds for Cheyenne River and Lower Brule Sioux

Congress intended the term "interest" in title VI of the Water Resources Development Act of 1999 to have its usual and customary meaning: the coupon rate of the debt obligation.

The universe of "available obligations" under title VI of the Water Resources Development Act of 1999 includes obligations of government corporations and government-sponsored entities whose charter statutes provide that their obligations are lawful investments for federal trust funds.

The fiduciary duty owed pursuant to a federal trust fund is defined and limited by the terms of the statute creating the trust.

January 19, 2001

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

You have asked for our opinion concerning the Secretary of the Treasury's investment responsibilities for the Cheyenne River Sioux Tribe and Lower Brule Sioux Tribe Terrestrial Wildlife Habitat Restoration Trust Funds ("the Sioux Trusts" or "the Trusts") under section 604(c) of the Water Resources Development Act of 1999 ("the Act"), in light of the federal government's trust responsibilities for Indian tribes. Specifically, you have inquired whether section 604(c)(2) of the Act requires Treasury to invest the Trusts' monies in obligations bearing the highest rate of interest, even when those obligations do not have the highest yields for the Trusts. You have also asked whether the universe of "available obligations" under section 604(c)(2) includes obligations of government corporations and government-sponsored entities ("GSEs") with provisions in their charter statutes making their securities lawful investments for all federal trust funds, notwithstanding the provision in section 604(c)(1) limiting the Secretary's investment of Trust monies to interest-bearing obligations of the United States or obligations guaranteed by the United States as to both principal and interest.

We conclude that, even if the Act requires the Secretary to assume the strictest of fiduciary duties when making investment decisions for the Sioux Trusts—a question we do not decide—this duty is defined and limited by the terms of the Sioux Trusts established in the Act itself. Under the Act, the Secretary must invest the Trust monies in the obligations with the highest rate of interest, not the highest yield, among available obligations. Furthermore, the universe of available obligations under the Act includes obligations of government corporations and GSEs whose charter statutes provide that their obligations are lawful investments for federal trust funds.

## I.

Title VI of the Water Resources Development Act of 1999, Pub. L. No. 106-53, 113 Stat. 269, 385-97, designates the Department of the Treasury as the program agency for managing trust funds for two South Dakota Sioux Indian tribes. The funds are to be used to finance the restoration of terrestrial wildlife habitat loss resulting from flooding related to certain federal water projects. Under the Act, the Secretary is required to transfer $5,000,000 from the general fund of the Treasury to the Sioux Trusts "for the fiscal year during which this Act is enacted and each fiscal year thereafter" until the aggregate amount in the Trusts is equal to at least $57,400,000. *Id*. § 604(b)(1). Of the total amount deposited, 74 percent must be deposited in the Cheyenne River Trust Fund, and 26 percent must be deposited in the Lower Brule Fund. *Id*. § 604(b)(2).

Section 604(c) of the Act governs the investment of the two Sioux Trusts. It provides:

> (c) INVESTMENTS.—
>
> (1) IN GENERAL.—The Secretary of the Treasury shall invest the amounts deposited under subsection (b) only in interest-bearing obligations of the United States or in obligations guaranteed as to both principal and interest by the United States.
>
> (2) INTEREST RATE.—The Secretary of the Treasury shall invest amounts in the Funds in obligations that carry the highest rate of interest among available obligations of the required maturity.

Paragraph (1) is a relatively common description of permitted investments for federal trust funds.[1] By contrast, paragraph (2)'s direction that the Secretary invest the Trust monies in the obligations with "the highest rate of interest among available obligations" is apparently unique among federal trust funds. We have been unable to identify a similar provision enacted by Congress, and your Office has informed us that it has never encountered such a provision.

---

[1] *See, e.g.*, 16 U.S.C. § 1606a(c)(2)(A) (Reforestation Trust Fund); 42 U.S.C. § 401(d) (Federal Old-Age and Survivors Insurance Trust Fund); 42 U.S.C. § 1104(b) (Unemployment Trust Fund); 42 U.S.C. § 1395i(c) (Federal Hospital Insurance Trust Fund); 42 U.S.C. § 1395t(c) (Federal Supplementary Medical Insurance Trust Fund).

## II.

Our interpretation of the investment provision of the Trusts must be considered in the context of the federal government's unique relationship with the Indian tribes. The federal government's trust responsibility to the Indians is a concept that has evolved over time. Although its origins can be found in an early Supreme Court opinion describing a tribe's relationship to the federal government as that "of a ward to his guardian,"[2] it has subsequently been applied by courts to establish and protect rights of Indian tribes and individuals in their dealings with the government. *See* Felix S. Cohen, *Handbook of Federal Indian Law* 220-28 (1982). The Supreme Court has on several occasions recognized what it has termed a "general trust relationship" between the United States and Indian tribes and people. *See, e.g.*, *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (noting "the undisputed existence of a general trust relationship between the United States and the Indian people" independent of statutes and regulations); *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942) ("[T]his Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people. . . . Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, [the federal government] has charged itself with moral obligations of the highest responsibility and trust.").[3]

As part of this responsibility to the Indians, Congress has established statutory trusts serving a wide variety of purposes. While acknowledging the existence of a general trust obligation between the government and the Indians, the Supreme Court has held that only certain statutory trusts impose affirmative fiduciary obligations on the United States. In *United States v. Mitchell*, 445 U.S. 535 (1980) ("*Mitchell I*"), the Supreme Court concluded that the language of the General Allotment Act, which required the United States to hold land "in trust for the sole use and benefit of the [allottee]," did not impose any fiduciary management duties on the United States or render it answerable for a breach of any such duties: "The [General Allotment] Act does not unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands." *Id.* at 541, 542 (quotation marks and internal citations omitted). The Court

---

[2] *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831). This case involved a suit filed by the tribe in the Supreme Court to enjoin enforcement of state laws on lands guaranteed to the tribe by various treaties. In concluding that the Court lacked original jurisdiction over tribal matters, Justice Marshall characterized the tribes as "domestic dependent nations" which "look to our government for protection; rely upon its kindness and its power; and appeal to it for relief to their wants; and address the President as their great father." *Id.*

[3] This unique relationship is further demonstrated by a line of cases that hold that any ambiguities in statutes or treaties dealing with Indian tribes are to be interpreted in favor of the tribes. *See DeCoteau v. Dist. County Ct.*, 420 U.S. 425, 444 (1975); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174 (1973); *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970).

further noted that Congress included the trust language "not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from state taxation." *Id.* at 544. In a second case, *United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*"), the Court reconsidered and elaborated on whether the United States had assumed fiduciary obligations as trustee with regard to the management of timber on tribal allotted lands. The Court concluded that the series of statutes and regulations governing the management of Indian lands was sufficient to create a fiduciary relationship where the Allotment Act by itself did not: "In contrast to the bare trust created by the General Allotment Act, the statutes and regulations [managing timber resources] clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Id.* at 224.

Lower courts have applied and elaborated upon the distinction between "bare" trusts and trusts giving rise to full fiduciary responsibilities. For example, in *Brown v. United States*, 86 F.3d 1554 (Fed. Cir. 1996), the Federal Circuit held that a statutory scheme asserting control by the Secretary of the Interior over commercial leasing of allotted lands constituted more than a limited trust and thereby gave rise to enforceable fiduciary obligations under *Mitchell II*. The court reiterated the *Mitchell II* criteria for imposition of fiduciary duties and observed that an express reference to a fiduciary duty was not necessary: "'[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.'" *Id.* at 1560 (quoting *Mitchell II*, 463 U.S. at 225). In an application of *Mitchell I*, the District of Columbia Circuit held that the establishment of an explicit trust as a mere funding mechanism and without significant governmental management duties would not impose any fiduciary responsibilities to those who may benefit from the trust. *Nat'l Ass'n of Counties v. Baker*, 842 F.2d 369 (D.C. Cir. 1988). There, the court considered the State and Local Government Fiscal Assistance Trust Fund, created under the Revenue Sharing Act to provide "noncategorical financial assistance to local governmental units in the form of annual entitlements." *Id.* at 372. Associations of local governments brought suit asserting that the Act created a federal fiduciary responsibility under *Mitchell II* to the local governments that were beneficiaries of the trust. The court held, however, that the trust was only a funding mechanism and did not include the type of control or management scheme that gives rise to fiduciary obligations:

> While it is true that the Revenue Sharing Act establishes a Trust Fund and names the Secretary as the trustee, we believe the Act creates only a limited trust relationship similar to the trust discussed in [*Mitchell I*]. . . . We do not think that when Congress created this Trust Fund and made the Secretary trustee Congress did so with the intent that the trustee would be subject to money damages for breaches of fiduciary duties. Rather, Congress created the Trust Fund in order to ensure constant funding for the Revenue Sharing Programs. . . . By creating the Trust Fund Congress was able to appropriate funds in advance, for the life of the program, thus enabling the local governments to budget their programs in advance.

*Id.* at 375, 376.

The Sioux Trusts at issue here have qualities of both the *Mitchell I* and the *Mitchell II* trusts. On the one hand, the Trusts can be viewed as a funding mechanism for money appropriated by Congress—money that will ultimately be disbursed after capitalization to the tribes for their use in wildlife habitat restoration. Thus, one might conclude that the Trusts do not constitute federal "control or supervision over tribal monies or properties" in the sense contemplated by *Mitchell II*, but rather are bare trusts or appropriation tools akin to those discussed in *Mitchell I* or *Baker*. On the other hand, the statutory scheme is intended to compensate the tribes for losses incurred to their lands as a result of flooding related to a federal water project, and the Act contains very specific federal controls and limitations on the tribes' spending of the monies transferred for their use. *See* Pub. L. No. 106-53, § 604(d)(3), 113 Stat. at 390.

Even assuming, however, that the Act requires the federal government to assume the strictest of fiduciary obligations to the tribes, that responsibility is still defined by the terms of the statute itself. Indeed, in *Mitchell II*, the Court concluded that the statutes and regulations giving the federal government responsibility to manage Indian resources and land for the benefit of the Indians both "establish a fiduciary relationship *and define the contours of the United States' fiduciary responsibilities*." 463 U.S. at 224 (emphasis added). Courts that have found a fiduciary obligation akin to that in *Mitchell II* have similarly held that the statutory scheme creating a government trust both defines and limits the nature of the government's duties. *See Brown*, 86 F.3d at 1563 (quoting *Mitchell II* and holding that the validity of a tribe's breach of trust claim must be measured against the terms of the statute creating the trust and its accompanying regulations); *Short v. United States*, 50 F.3d 994, 998-99 (Fed. Cir. 1995) (statute dictating interest rate for Indian Money, Proceeds for Labor trust accounts controls payment of interest on trust funds held by the United States for the benefit of Indians); *Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States*, 512 F.2d 1390, 1393 (Ct. Cl. 1975) (holding that tribes' suit for breach of fiduciary duty based on the United

States' breach of its duties as trustee to tribes would be determined by reference to the statutory scheme governing Indian trust funds deposited in the Treasury). Thus, even assuming that the United States owes the Sioux tribes the strictest of fiduciary obligations in administering the Trusts (in addition to its general obligations of good faith and fair dealing with the Indian tribes), the specifics of that obligation are found in the statute creating the trust: "Whatever the scope of the government's legal duties under the [Indian] trust, the source is statutory law. The extent of a trustee's duties and powers is determined by the trust instrument and the rules of the law which are applicable. Accordingly, even though the trust is a trust as that term is used in *Mitchell II*, plaintiffs must point to rights granted by statute if they are to be enforced against the government." *Cobell v. Babbit*, 91 F. Supp. 2d 1, 30 (D.D.C. 1999) (citations and internal quotation marks omitted).

## III.

With this principle in mind, we turn to the specific questions of statutory interpretation. First, we consider whether section 604(c)(2), which directs the Secretary to invest the Sioux Trusts in obligations "that carry the highest rate of interest among available obligations of the required maturity," requires the Secretary to invest the trust funds in obligations with the highest coupon rate, or those obligations with the highest yield. We understand that this distinction has significant investment consequences. The coupon rate of a security is the stated annual rate of interest on the face value of a debt security. Barron's Financial Guides, *Dictionary of Financial and Investment Terms* 116 (4th ed. 1995). For instance, one might purchase a $1000 bond with a 10 percent coupon rate, earning $100 per year. In contrast, the "yield" of a security is a way of describing an investor's percentage return on his investment. *Id.* at 663-64. A $1000 bond with a 10 percent coupon rate that is purchased for $1000 offers a 10 percent current yield or "effective rate." *Id.* at 159. Yet that same $1000 bond with a 10 percent coupon rate, but purchased for $500, would offer an investor a 20 percent yield. When the price of a bond falls, its yield rises, and vice versa.

In *Old Colony Railroad Co. v. Comm'r*, 284 U.S. 552 (1932), the Supreme Court considered a tax statute that permitted companies to deduct from their income "all interest paid or accrued within the taxable year" to holders of its bonds. *Id.* at 554. Old Colony sold its bonds at a premium and sought to deduct the amount of the interest payments (the coupon rate) on those bonds from its gross income. The government argued that Old Colony could not do so because the statute that authorized the deduction of "all interest paid or accrued" actually referred to the effective rate (or the yield) of the bond, not the coupon rate. Because Old Colony sold its bonds at a premium, the government argued that it could only deduct the lower effective rate, not the rate on the face of the coupon. The Supreme Court disagreed and held that when Congress uses the word

"interest" without further explanation, it intends the usual meaning of the word, which is the coupon rate:

> [A]s respects "interest," the usual import of the term is the amount which one has contracted to pay for the use of borrowed money. He who pays and he who receives payment of stipulated amount conceives that the whole is interest. In the ordinary affairs of life no one stops for refined analysis of the nature of a premium, or considers that the periodic payment universally called "interest" is in part something wholly distinct—that is, a return of borrowed capital. . . . We cannot believe that Congress used the word having in mind any concept other than the usual, ordinary and everyday meaning of the term, or that it was acquainted with the accountants' phrase "effective rate" of interest and intended that as the measure of the permitted deduction.

*Id*. at 560-61.[4]

In an opinion interpreting the Second Liberty Bond Act, the Attorney General likewise concluded that the term "interest" was unambiguous. *See Second Liberty Bond Act, As Amended—Bonds Issued at Discount—Effective Rate of Interest or Cost to Treasury*, 42 Op. Att'y Gen. 27 (1961). There, the Attorney General considered whether the Secretary of the Treasury could sell discounted bonds at a coupon rate of 4¼ percent, thereby resulting in a greater yield or effective rate, where the Bond Act limited the "rate or rates of interest" on United States bonds to 4¼ percent. *Id*. at 29. Citing *Old Colony*, the Attorney General concluded that the limitation on interest rate referred to the coupon rate, and could not be read as a limit on the effective rate or yield of the bond: "[W]hen Congress uses the term 'interest' in connection with bonds without further explanation, it refers to the coupon or stated rate, the usual meaning of that term, and not to the accountants' concept of effective rate." *Id*.

We recognize, of course, that any ambiguities in statutes dealing with Indian tribes are to be construed in favor of the tribes. *See supra* note 3 (citing cases). But, like the Supreme Court in *Old Colony* and the Attorney General in his 1961 opinion construing the terms of the Second Liberty Bond Act, we conclude that the term "interest" is unambiguous. As the Court and the Attorney General explained, the term "interest" in the Water Resources Development Act has its usual and customary meaning—i.e., the coupon rate of the obligation. The

---

[4] The Court noted that, "*[i]f* there were doubt as to the connotation of the term, and another meaning *might* be adopted, the fact of its use in a tax statute would incline the scale to the construction most favorable to the taxpayer." *Id*. at 561 (emphases added). The opinion makes clear, however, that the Court did not believe the term "interest" was ambiguous.

conclusion that Congress intended this ordinary meaning when it used the term in connection with the Sioux Trusts is buttressed by the rule that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute," and to adopt that interpretation when it "adopts a new law incorporating sections of a prior law." *Lorillard v. Pons*, 434 U.S. 575, 580, 581 (1978). Here, Congress has employed a term with a long-established judicial and administrative interpretation, and there is nothing in the legislative history of the Act indicating that Congress intended the term to have a different meaning in section 604(c)(2).

Accordingly, under the Act, the Secretary is required to invest the Sioux Trust fund monies in the obligations carrying the highest coupon rate, regardless of whether such investments offer the highest yield. To the extent that the Secretary has a fiduciary obligation to the Sioux tribes by virtue of the trust fund mechanism, this duty is defined by, and thus requires compliance with, the investment criteria set forth explicitly in the Act. Although investing in securities offering the highest yield might maximize the amount of income to the Funds, it is not what Congress instructed the Secretary to do. *Cf. Pawnee v. United States*, 830 F.2d 187, 191 (Ct. Cl. 1987) (no valid claim for breach of a fiduciary duty is stated where "the claim is simply that the Interior Department is compelled to go contrary to and beyond the [controlling] regulations and the leases in order to fulfill its alleged fiduciary obligation").

## IV.

Your second question is whether the universe of "available obligations" that must be considered in determining the obligations "carry[ing] the highest rate of interest" under section 604(c)(2) includes securities of government corporations and government-sponsored entities ("GSEs") that have provisions in their charter statutes making their securities lawful investments for all federal trust funds, notwithstanding the provision in section 604(c)(1) of the Act limiting Sioux Trust investments to interest-bearing obligations of the United States or obligations guaranteed as to both principal and interest by the United States.

The charter statutes of various government corporations and GSEs whose obligations are explicitly *not* guaranteed by the United States as to principal and interest include a provision similar or identical to the following:

> Obligations issued . . . shall be lawful investments and may be accepted as security for all fiduciary, trust, and public funds, the

investment or deposit of which shall be under the authority or control of any officer or agency of the Government of the United States.[5]

In accordance with several opinions of the Department of Justice, federal case law, and a Comptroller General opinion, we conclude that securities issued by entities whose charters include such "trust fund eligibility" language are appropriate investments for federal trust funds, even where those trust fund statutes specifically limit the investment of funds to federal government obligations or obligations guaranteed by the United States.

In 1996, our Office considered whether the Secretary of the Treasury could invest Civil Service Retirement and Disability Fund ("CSRDF") monies in debt obligations issued by the United States Postal Service ("USPS") and the Tennessee Valley Authority ("TVA"). *Transactions Between the Federal Financing Bank and the Department of the Treasury*, 20 Op. O.L.C. 64 (1996) ("1996 Opinion"). The relevant statutes of the CSRDF trust fund and the GSEs were virtually identical to those at issue here. In what the 1996 Opinion termed "boilerplate" language governing the investment of government-managed trust funds, *id*. at 68, the CSRDF statute authorized the Secretary to invest in "interest-bearing obligations of the United States, or obligations guaranteed as to both principal and interest by the United States." 5 U.S.C. § 8348(e).[6] The USPS and TVA statutes indicated, as they do now, that their debt obligations were not guaranteed by the United States as to principal and interest, *see* 39 U.S.C. § 2005(d)(5); 16 U.S.C. § 831n-4(b), yet they were lawful for trust fund investments under the authority or control of any United States officer or agency, *see* 39 U.S.C. § 2005(d)(3); 16 U.S.C. § 831n-4(d). Ultimately, we relied upon federal case law, "the longstanding practice and understanding of the Treasury and Justice Departments," and a 1985 Comptroller General opinion in determining the relationship between the boilerplate trust investment instructions and the trust fund eligibility language of the government corporations and GSEs. 1996 Opinion, 20 Op. O.L.C. at 69. We concluded that the CSRDF monies could be invested in the USPS and TVA obligations. *Id*. at 68.

---

[5] 39 U.S.C. § 2005(d)(3) (investment eligibility provision for United States Postal Service obligations). *See also* 16 U.S.C. § 831n-4(d) (investment eligibility provision for Tennessee Valley Authority bonds); 12 U.S.C. § 1452(g) (investment eligibility provision for Federal Home Loan Mortgage Corporation).

[6] The relevant portion of the CSRDF statute states that the Secretary shall "invest in interest bearing securities of the United States such currently available portions of the Fund as are not immediately required for payments from the Fund." 5 U.S.C. § 8348(c). It further directs that the Secretary purchase "public-debt obligations" with certain maturities, *id*. § 8348(d), and specifies that the Secretary "may purchase other interest-bearing obligations of the United States, or obligations guaranteed as to both principal and interest by the United States . . . if he determines that the purchases are in the public interest," *id*. § 8348(e).

In the 1996 Opinion, we relied upon *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1244-45 (N.D. Cal. 1973), a federal district court opinion concluding that the TVA trust fund eligibility language, as well as the language in several other GSE charter statutes, rendered TVA obligations eligible for Indian trust fund investments, notwithstanding language in the particular Indian trust fund statute, 25 U.S.C. § 162(a), limiting investments to United States public debt obligations and other obligations guaranteed as to principal and interest by the United States. The court specifically noted that its conclusion regarding the effect of the broad trust fund eligibility language was "in accord with the intent of Congress." 363 F. Supp. at 1245. The 1996 Opinion also cited two prior instances where the Department opined that trust fund eligibility language authorized investment in obligations of government corporations or GSEs where the specific trust fund statute at issue did not expressly authorize it. First, in a 1966 opinion concerning the obligations of federal land banks and banks for cooperatives which considered trust fund eligibility language different from that discussed here, our Office noted in passing that language identical to the TVA trust fund eligibility provision[7] "presents no problems of construction and plainly permits investments of the various Government trust funds in the affected securities whether or not the statutes creating the trust themselves do so." Letter for Fred B. Smith, General Counsel, Department of the Treasury, from Frank M. Wozencraft, Assistant Attorney General, Office of Legal Counsel at 2 (Oct. 7, 1966). Second, in a 1934 opinion by Attorney General Homer Cummings, the Department advised that government-managed postal savings funds could be invested in bonds issued under the Federal Farm Mortgage Corporation Act because of the Act's trust fund eligibility language, even though the Postal Savings Act creating the trust fund only specified authority to invest in "bonds or other securities of the United States." *Investment of Postal Savings Funds in Bonds of Federal Farm Mortgage Corporation*, 37 Op. Att'y Gen. 479, 480 (1934). In addition to these prior statements by the Department of Justice, the 1996 Opinion cited "Treasury's longstanding practice to invest monies contained in government-managed trust funds . . . in public debt obligations or other obligations that have been authorized by Congress as legal investments for all government-managed trust funds," 20 Op. O.L.C. at 70, as well as a 1985 Comptroller General opinion supporting the investment of CSRDF trust funds in Federal Financing Bank obligations which were not public debt obligations, but were eligible for federal trust fund investment pursuant to the Federal Financing Bank statute.[8]

---

[7] According to the 1996 Opinion, the language of the statute at issue provided: "'[Obligations issued] shall be lawful investments and may be accepted as security, for all fiduciary, trust, and public funds the investment or deposit of which shall be under the authority or control of the United States or any officer or officers thereof.'" 20 Op. O.L.C. at 69 n.9 (quoting statute).

[8] Memorandum for the Honorable John J. LaFalce, Chairman, Subcommittee on Economic Stabilization, House Committee on Banking, Finance, and Urban Affairs, from the Comptroller General of the

Finally, in addition to relying upon the foregoing authority, the 1996 Opinion applied the principle of statutory construction dictating that statutes on the same subject should be read in harmony with one another, 2B Norman J. Singer, *Sutherland on Statutes and Statutory Construction* § 51.02, at 121-22 (5th ed. 1992). Thus, the opinion concluded that

> [b]ecause the CSRDF statute's investment provisions do not purport to supersede other statutes establishing that obligations issued there-under are eligible investments for government-managed trust funds and the relevant USPS and TVA statutes demonstrate Congress's intention that obligations issued thereunder be eligible investments for all government-managed trust funds, the better interpretation is that the relevant USPS and TVA statutes have the effect of expand-ing the universe of authorized CSRDF investments.

20 Op. O.L.C. at 69 n.7.[9]

The weight of this authority leads us to conclude that the obligations available for investment under the Water Resources Development Act must include obligations of those government corporations and GSEs whose charter statutes include the federal trust fund eligibility language. Federal case law, OLC opinions, and a Comptroller General opinion, as well as past practice, all indicate that the trust fund eligibility language found in GSE charter statutes is best read as expanding the universe of available obligations set forth in the "boilerplate" provisions of the statutes governing the investments of government-managed trust funds. Congress enacted the Sioux Trust provisions against this backdrop of federal law and governmental practice and, accordingly, we conclude that Congress intended to make government corporation and GSE obligations available for investment by the Secretary for these trusts. *See Lorillard*, 434 U.S. at 581 (noting that it may be appropriate to presume Congress to be "aware of an administrative or judicial interpretation of a statute" when it "adopts a new law incorporating sections of a prior law").

---

United States (Oct. 30, 1985), *reprinted in The Federal Financing Bank and the Debt Ceiling*, *Hearing Before the Subcomm. on Economic Stabilization of the House Comm. on Banking, Finance and Urban Affairs*, 99th Cong. 31, 32 (1985). The opinions and legal interpretations of the General Accounting Office and the Comptroller General often provide helpful guidance on appropriations matters and related issues. However, they are not binding upon departments, agencies, or officers of the Executive Branch. *See Bowsher v. Synar*, 478 U.S. 714, 727-32 (1986).

[9] While our 1996 Opinion mentions that the TVA and USPS statutes with the trust fund eligibility language were enacted several years after the CSRDF trust fund statute, 20 Op. O.L.C. at 67, that fact is neither mentioned nor relied upon by *Manchester Band* or the Department of Justice or Comptroller General authority discussed herein. Accordingly, we do not believe the temporal relationship between the two statutory schemes to be essential to our prior conclusion, and we interpret the reference in the 1996 Opinion to be an additional point reinforcing the outcome.

For the reasons set forth above, we conclude that the Secretary, in fulfilling the government's responsibilities to the Sioux tribes under the Act, must consider obligations of government corporations and GSEs whose charter statutes include trust fund eligibility language when determining which obligations carry the highest coupon rate of interest.

JOSEPH R. GUERRA
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
